

**Sterling Merchant Finance Ltd**
*Merchant Bankers*

June 30, 2014

<span style="color:teal">**The Office of the Senior Managing Director**</span>

**Mr. Hugo H. Siblesz**
Secretary-General
**Permanent Court of Arbitration**
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands
F: +31 70 302 4167
E: bureau@pca-cpa.org

Dear Mr. Siblesz:

>     **RE:** Designation of an Appointing Authority on the Arbitration between Sterling Merchant
>     Finance Ltd v. Government of Cape Verde in relation to management contract for TACV
>     Cape Verde Airlines

I am the Senior Managing Director and CEO of Sterling Merchant Finance Ltd which served for nearly two years as the manager of TACV Cape Verde Airlines, under a management contract signed on October 30, 2006 with the Government of the Republic of Cape Verde to implement the TACV's operational and financial restructuring, develop a sound recovery and privatization strategy for the airline, identify international partners and networks for TACV and initiate integration and privatization negotiations. A copy of the contract is attached in Annex1. From November 30, 2007 to June 13, Sterling Merchant Finance Ltd seconded a Chief Executive Officer and provided over 1,000 days of consulting and technical assistance to TACV.

Unfortunately the Government of the Republic of Cape Verde failed to pay for the last portion of our fees. As per Art. 7.1 of the contract, we have used all amicable ways to secure the payment including writing dozens of letters to key official of the Government of the Republic Cape Verde, to no avail.

Art. 7.2 of the contract states: "*Any dispute, controversy, or claim arising out of or relating to this contract or the breach, termination, or invalidity thereof, shall be settled by arbitration, in accordance with the UNICITRAL Arbitration Rules as at present in force*".

On October 6, 2010 we filed a demand for arbitration in accordance to Art. 7.2 with ADR Systems and we complied with the requirements for a Notice of Arbitration set out in Article 3 of the 1976 Rules. The Respondent refused to respond, to acknowledge the arbitration administrator and instead chose to dismiss the arbitration court. A copy of the Demand for Arbitration and proof of mailing is attached in Annex 2.

**Page two**
Mr. Hugo H. Siblesz

On June 18, 2012, we filed a new demand with the International Center for Dispute Resolution (ICDR) and the Government of the Republic of Cape Verde chose again to ignore the arbitration process by not acknowledging the court and not responding. A copy of ICDR's letters to the parties is attached in Annex 3.

We have since reached out the Government of the Republic of Cape Verde's highest authority to seek a compromise and we were ignored. A samples of letters sent to the Prime Minister of the Republic of Cape Verde is attached in Annex 4.

Since no appointing authority has been previously designated by the parties in the contract and the parties have not reached an agreement on an appointing authority within 30 days following our proposal to appoint ADR System and later ICDR, I write in accordance with Article 6, para.2 of the 2010 UNCITRAL Arbitration Rules which entrust to you the role of designating an "appointing authority" to respectfully request that you designate the appointing authority in respect to the case Sterling Merchant Finance Ltd vs the Government of the Republic of Cape Verde.

I would like to respectfully ask that you designate the following institution as the appointing authority:

> International Center for Dispute Resolution (ICDR)
> 1633 Broadway
> 10th floor
> New York, NY 10019
> Tel. + 1 212 484 4181
> Fax. + 1 212 246 7274

We are accompanying our request with the following:

- A copy of the contract with the arbitration clause establishing the applicability of the UNCITRAL Arbitration Rules (Annex 1);
- A copy of the demand for arbitration served to by ADR Systems (Annex 2);
- A copy of the invitation for arbitration and other correspondence by ICDR (Annex 3);
- A copy of letters sent to the Republic of Cape Verde highest officials (Annex 4)
- A copy of a revised invoice covering our original claim, interest, legal costs and collection cost as of September 2013 (Annex 5);
- A power of attorney evidencing the authority of the person making the request (Annex 6); and
- Copy of the wire transfer confirmation of the administrative fee by UBS (Annex 7).

Please kindly also send your response to the following representatives of the Respondent:

> H.E. José Maria Pereira Neves
> Prime Minister
> Palácio do Governo
> Várzea Cidade da Praia
> Ilha de Santiago 304
> REPUBLIC OF CAPE VERDE
> Email: edna.moreno@palgov.gov.cv

**Page three**
Mr. Hugo H. Siblesz

**Growth and Competitiveness Project**
Ministerio de Economia, Crescimento e Competitividade
c/o Julio Fortes
Avenida Cidade de Lisboa
P.O. Box 323
Praia
Cape Verdes
Tel. (238) 260 1020 or (238) 261 4748 / 2319
Fax: 011-238-261-2334
Email: Julio.Fortes@minfin.gov.cv and Jfortes@ucp.gov.cv

**Ministry of Finance, Planning and Regional Development**
c/o Cristina Duartes
Avenida Amilcar Cabral 107
P.O. Box 30
Praia
Cape Verdes
Email: jessica.sanche@minf.gov.cv; pedrina.silva@minf.gov.cv

Please do not hesitate to contact me if you have any question.

Yours sincerely,

Sir Roger B. JANTIO

**ANNEX 1:  CONTRACT BETWEEN THE PARTIES**

# I.  Form of Contract

## LUMP-SUM REMUNERATION

This CONTRACT (hereinafter called the "Contract") is made the 30th day of the month of October, 2006, between, on the one hand, The Growth and Competitiveness Project (hereinafter called the "Client") and, on the other hand Sterling Merchant Finance Ltd (hereinafter called the "Consultants").

WHEREAS

(a)     the Client has requested the Consultants to provide certain consulting services as defined in the General Conditions of Contract attached to this Contract (hereinafter called the "Services");

(b)     the Consultants, having represented to the Client that they have the required professional skills, and personnel and technical resources, have agreed to provide the Services on the terms and conditions set forth in this Contract;

(c)     the Client has received a credit from the International Development Association (hereinafter called the "Association") towards the cost of the Services and intends to apply a portion of the proceeds of this credit to eligible payments under this Contract, it being understood (i) that payments by the Association will be made only at the request of the Client and upon approval by the Association, (ii) that such payments will be subject, in all respects, to the terms and conditions of the agreement providing for the credit, and (iii) that no party other than the Client shall derive any rights from the agreement providing for the credit or have any claim to the credit proceeds;

NOW THEREFORE the parties hereto hereby agree as follows:

1.      The following documents attached hereto shall be deemed to form an integral part of this Contract:

(a)     The General Conditions of Contract;
(b)     The Special Conditions of Contract;
(c)     The following Appendices:

Appendix A:  Description of the Services
Appendix B:  Reporting Requirements
Appendix C:  Key Personnel and Subconsultants
Appendix D:  Breakdown of Contract Price in Foreign Currency   Not used
Appendix E:  Breakdown of Contract Price in Local Currency     Not used
Appendix F:  Services and Facilities Provided by the Client

Appendix G:  Consultant's Technical Proposal
Appendix H:  Consultant's Financial Proposal

2.      The mutual rights and obligations of the Client and the Consultants shall be as set forth in the Contract, in particular:

   (a)     The Consultants shall carry out the Services in accordance with the provisions of the Contract; and

   (b)     The Client shall make payments to the Consultants in accordance with the provisions of the Contract.

IN WITNESS WHEREOF, the Parties hereto have caused this Contract to be signed in their respective names as of the day and year first above written.

For and on behalf of *Growth and Competitiveness Project*

_____

For and on behalf of *Sterling Merchant Finance, Ltd*

_____
*Roger B. Jantio*

# II.  General Conditions of Contract

## 1. GENERAL PROVISIONS

**1.1 Definitions**     Unless the context otherwise requires, the following terms whenever used in this Contract have the following meanings:

(a)   "Applicable Law" means the laws and any other instruments having the force of law in the Government's country (or in such other country as may be specified in the Special Conditions of Contract (SC)), as they may be issued and in force from time to time;

(b)   "Bank" means the International Bank for Reconstruction and Development, Washington, D.C., U.S.A.;

**or**

(b)   "Association" means the International Development Association, Washington, D.C., U.S.A.;

(c)   "Contract" means the Contract signed by the Parties, to which these General Conditions of Contract (GC) are attached, together with all the documents listed in Clause 1 of such signed Contract;

(d)   "Contract Price" means the price to be paid for the performance of the Services, in accordance with Clause 6;

(e)   "Foreign Currency" means any currency other than the currency of the Government;

(f)   "GC" means these General Conditions of Contract;

(g)   "Government" means the Government of the Client's country;

(h)   "Local Currency" means the currency of the Government;

(i)   "Member," in case the Consultants consist of a joint venture of more than one entity, means any of these entities; "Members" means all these entities, and "Member in Charge" means the entity specified in the SC to act on their behalf in exercising all the Consultants' rights and obligations towards the Client under this Contract;

(j)   "Party" means the Client or the Consultants, as the case may be, and "Parties" means both of them;

## 7. SETTLEMENT OF DISPUTES

**7.1 Amicable Settlement**

The Parties shall use their best efforts to settle amicably all disputes arising out of or in connection with this Contract or its interpretation.

**7.2 Dispute Settlement**

Any dispute between the Parties as to matters arising pursuant to this Contract that cannot be settled amicably within thirty (30) days after receipt by one Party of the other Party's request for such amicable settlement may be submitted by either Party for settlement in accordance with the provisions specified in the SC.



# III. Special Conditions of Contract

| Number of GC Clause | Amendments of, and Supplements to, Clauses in the General Conditions of Contract |
| --- | --- |

**1.1(i)**      The Member in Charge is Sterling Merchant Finance, Ltd.

**1.3**          The language is *English*.

**1.4**          The addresses are:

| | |
| --- | --- |
| Client: | The Government of the Republic of Cape Verde |
| Attention: | Growth and Competitiveness Project Coordination Unit, Mr. Rui Cardoso-Santos |
| Telex: | |
| Facsimile: | +238 261-2334 |
| | |
| Consultants: | Sterling Merchant Finance Ltd |
| Attention: | Mr. Roger B. Jantio |
| Telex: | |
| Facsimile: | +1 202 785 35 05 |

**1.6**          The Authorized Representatives are:

For the Client:          Rui Cardoso-Santos

For the Consultants:   Roger B. Jantio

**1.7**          The Client warrants that the Consultants and their Personnel (as well as the Subconsultants and their Personnel) shall be exempt from any taxes, duties, fees, levies, and other impositions levied, under the Applicable Law, on the Consultants and the Personnel in respect of:

(a)   any payments made to the Consultants, Subconsultants, and the Personnel of either of them (other than nationals of the Government or permanent residents of the Government's country), in connection with the carrying out of the Services;

(b)   any equipment, materials, and supplies brought into the Government's country by the Consultants or Subconsultants for the purpose of carrying out the Services and which, after having been brought into such territories, will be subsequently withdrawn therefrom by them;

(c)   any equipment imported for the purpose of carrying out the Services and paid for out of funds provided by the Client and which is treated as property of the Client;

(d)    any property brought into the Government's country by the Consultants, any Subconsultants, and the Personnel of either of them (other than nationals of the Government or permanent residents of the Government's country) for their personal use and which will subsequently be withdrawn therefrom by them upon their respective departure from the Government's country.

**2.1**      The date on which this Contract shall come into effect is October 30th, 2006.

**2.2**      The date for the commencement of Services is December 31st, 2006.

**2.3**      The period shall be twelve (12) months.

**3.2.3**

"For a period of two years after the expiration of this Contract, the Consultants shall not engage, and shall cause their Personnel as well as their Subconsultants and their Personnel not to engage, in the activity of a purchaser (directly or indirectly) of the assets on which they advised the Client under this Contract, nor shall they engage in the activity of an adviser (directly or indirectly) of potential purchasers of such assets."

**3.4**      The risks and coverage shall be:

(i)     Third Party motor vehicle _____

(ii)    Third Party liability _____

(iii)   Employer's liability and workers' compensation _____

(iv)    Professional liability _____

(v)     Loss or damage to equipment and property _____

**3.7**

- "The Consultants shall not use these documents for purposes unrelated to this Contract without the prior written approval of the Client."

- "The Client shall not use these documents for purposes unrelated to this Contract without the prior written approval of the Consultants."

- "Neither Party shall use these documents for purposes unrelated to this Contract without the prior written approval of the other Party."



**6.2(a)**          **The amount in foreign currency or currencies is USD 950,490.62 (nine hundred and fifty thousand, four hundred and ninety U.S. Dollars and sixty-two cents).**

**6.2(b)**          The amount in local currency is N/A.

**6.4**             The accounts are:

for foreign currency:

| | |
|---|---|
| Bank | **Wachovia Bank, Roanoke, Virginia 24012** |
| Beneficiary | Sterling Merchant Finance Limited |
| Current A/c (USD) | |
| ABA No. | **051400549** |
| Swift Code No. | **PNBPUS33** |
| Account No. | **Acct#: 5050000000631 Further Credit: Sterling Merchant Finance: Acct: 8069-7020** |

for local currency:  *N/A*

Payments shall be made according to the following schedule:

- Ten (10) percent of the Contract Price shall be paid on the commencement date.

- Fifteen (15) percent of the lump-sum amount shall be paid upon submission and approval of the Assessment of TACV's current operational situation.

- Twenty (20) percent of the lump-sum amount shall be paid upon submission and approval of the Market Research and Strategic Development Plan.

- Twenty (20) percent of the lump-sum amount shall be paid upon submission and approval of the Comprehensive Five-Year Business Plan.

- Fifteen (15) percent of the lump-sum amount shall be paid upon submission and approval of the  List of Potential International Partners and Networks for TACV.

- Twenty (20) percent of the lump-sum amount shall be **subject to a positive evaluation of the management mandate, based on the non-measurable and measurable performance indicators set henceforth.**

*Note: The Client shall respond to all deliverables submitted by the Consultant within 10 business days of each submission. If the Client's response is not forthcoming in that period, said deliverables shall be deemed approved. In the case the deliverables submitted by the Consultant are not approved by the Client, the latter shall detail the specific reasons for any objection and indicate a*

*reasonable timeframe for these objections to be addressed in a satisfactory manner by the Consultant. The spirit of this clarification is to avoid situations where the Client may provide general and subjective feedback to the Consultant with observations that might not be easily corrected in light of the resources available for this assignment.*

**6.5**          Payment shall be made within twenty (20) days of receipt of the invoice and the relevant documents specified in Clause 6.4, and within thirty (30) days in the case of the final payment.

**7.2**          Any dispute, controversy, or claim arising out of or relating to this contract, or the breach, termination, or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force.



# IV. Appendices

## APPENDIX A — DESCRIPTION OF THE SERVICES

### Introduction

Over the last decade, the Government of the Republic of Cape Verde (GoCV) has been implementing a comprehensive economic reforms program aimed at transforming the private sector into the principal agent of national economic development, in place of the State. One of the main components of these reforms program is the **privatization of State-owned enterprises**, where substantial results have already been achieved. Public and mixed enterprises have been reduced in number from about 40 in 1992 to 5 today.

In tandem with the privatizations program, the GoCV has been developing, a **regulatory capacity building program**, aimed at developing, from ground zero, the regulatory institutions that are so fundamental in regulating the various sectors of economic activity and inspiring investors' confidence in any economy. To date, five regulatory agencies have been started and are operational – a civil aviation authority (AAC); a multi-sector agency (ARE), overseeing urban transportation, electricity, and water; a telecommunications/electronic communications regulatory agency (ANAC); a pharmaceuticals, food and quality control regulatory agency (ARFA); and an agency for food security (ANSA). One more agency is expected to become operational in the coming months: a maritime regulatory agency (IMP).

Both the privatizations and regulatory capacity building programs are implemented by the Growth and Competiveness Project's Coordination Unit (PCU), under the supervision of the Ministry of Economy, Growth and Competitiveness, and are co-financed by the International Development Agency (IDA) of the World Bank and the GoCV.

**TACV – Cabo Verde Airlines –** is the international scheduled passenger airline and the flag carrier of Cape Verde. The Government of Cabo Verde is the majority shareholder. TACV does operate out of its bases in Sal and Praia, and the airline currently serves 19 destinations, domestically and abroad, with a fleet of 5 aircraft: 3 ATR 42-300s, 1 Boeing 757-200 and 1 Boeing 737-300. TACV carried over 590,000 passengers in 2005. However, TACV's operations have not been profitable in recent years and the losses for 2005 topped US$1 million.  The losses are mainly a consequence of an overly optimistic expansion towards the West African market in 2002, which proved more difficult and costly than anticipated, less than optimal operations and factors affecting the worldwide civil aviation industry (such as significant fuel and insurance premium increases, etc.). The Board of TACV and its new management have taken corrective measures by retrieving from loss making markets and by cutting cost. These measures have so far produced encouraging results, which must now be sustained, if the long-term viability of the airline is to be secured.

On the other hand, Cape Verde has been certified IASA[1] category 1 by the US Federal Aviation Administration (FAA) in September 2003. This certification included a re-certification of TACV's Air Operator Certificate by IAC (Civil Aviation Institute; Civil Aviation Authority or AAC, today) to international standards, which now allows TACV to initiate scheduled air service to the USA.

Given the present difficulties of TACV, but also in light of the new opportunities, the Government and management of TACV recognized that a sustainable recovery and expansion of the airline would only be possible if TACV was restructured, privatized, and integrated into an international airline network. The GoCV has therefore decided to call for proposals for an international airline management mandate, which should be based on the following TOR. It should be noted that references to management or management mandate, in the context of these TOR and the related assignment, allow for either a CEO or a management team headed by a CEO.

.

### Objectives of the Consulting Mandate

The main objective of the management mandate is to:

1. implement the TACV's operational and financial restructuring;
2. develop a sound recovery and privatization strategy for the airline;
3. identify international partners and networks for TACV; and
4. initiate integration and privatization negotiations.

### Scope of Work/Tasks

1. For the **implementation of the TACV's ongoing operational restructuring**, management must, from the beginning on, ensure management by both leading day-to-day operations and by implementing the necessary restructuring steps. Given the fact that the airline has already initiated its way towards recovery and is relatively small (6 aircraft), management will have sufficient time for the development of a recovery and privatization strategy.

2. The development of a sound **recovery and privatization strategy for the airline** will commence with an in-depth assessment of TACV's current situation and recent evolution, with the support of available studies that were commissioned by the PCU between 2000 and 2002. This assessment should focus on the following key areas:

   1. Corporate Structure & HR Management

   2. Finance & Controlling

   3. Network Management

---

[1] International Aviation Safety Assessment (IASA): category 1 certifies that a country complies with ICAO safety recommendations. This certification is a prerequisite for scheduled air transport to the USA.

4.  Revenue Management

5.  Product & Services

6.  Sales & Distribution

7.  Flight & Ground Operations

8.  Engineering and Maintenance

Following this assessment, a detailed **market research and strategic development plan** should take place based on the given objective of privatization. Management is required to provide at least two different strategic privatization options, after which the decision-makers at the GoCV can finally select the appropriate one for the final implementation strategy. Management shall therefore present the findings of the assessment and a restructuring plan in a workshop to be attended by the PCU and key Government Officials/decision makers. This workshop will serve to select and finalize the privatization option and to fix desired outcomes (performance indicators against which the work of management shall be evaluated).

Based on the outcome of the market research and strategic development plan, as well as on the conclusions of the workshop, management shall finalize the **strategic development plan of the airline** and prepare a **comprehensive five-year business plan**. This plan shall provide a clear roadmap for management action and will give investors a good insight into the airline's future potential. Furthermore, the business plan shall include specific performance indicators (including but not limited to sales volumes, cost saving, redundancies, etc.), agreed with the GoCV, against which the airline's performance shall be measured and the management mandate shall be evaluated.

3.  Based on the strategic development plan of the airline management shall identify **potential international partners and networks for TACV**. Potential partners for TACV should include operators (airlines, tour operators), as well as other investors (e.g. financial investors). Airline networks must have a strategic fit with TACV's development.

For the identification and evaluation of the above mentioned potential partners, management shall establish direct contact with partners and networks. However, management must obtain no-objection from the PCU for entering concrete negotiations for a possible cooperation or acquisition.

4.  Once the potential partners have been defined and agreed upon, management shall market the privatization of TACV and **initiate integration and privatization negotiations**.The objective of the integration and privatization negotiations is to lead TACV towards an acquisition transaction with a private party. However, the final transaction may require additional specialized (e.g. mergers and acquisitions services and legal advice), which will be provided separately by either or both, the seller and the acquirer. All steps and positions negotiated for and on behalf of the shareholders of TACV and of the GoCV shall be agreed upon between management and the GoCV,

5. Management shall propose a training plan for, and impart industry knowledge on, line managers and higher level managers that are active during the management contract. Training is required to build endogenous management capacity at TACV, which will not only increase the value of the airline's organizational assets but will also provide a safety net in terms of added management competence and effectiveness in the unlikely event that market conditions delay TACV's privatization beyond the term of the management mandate. One idea could be to contemplate the designation, by the management and the GoCV, of "successor managers", whom would be trained and prepared to assume management at the end of the management contract.

The consultant shall complete all of the above indicated tasks, without prejudice of any further refinement of the scope of work that may be obtained in initial meetings with the PCU or that may result from findings from the assessment referred in number 2 of this section of these terms of reference.

**List and Schedule of Deliverables and Actions**

1. Immediate take-over of operational management (CEO)

2. Assessment of TACV's current operational situation, with focus on:
   - Corporate Structure & HR Management
   - Finance & Controlling
   - Network Management
   - Revenue Management
   - Product & Services
   - Sales & Distribution
   - Flight & Ground Operations

3. Market research and strategic development plan

4. Comprehensive five-year business plan

5. List of potential international partners and networks for TACV, and request for expressions of interest.

Deliverable 2 shall be submitted in draft to the PCU no later than 3 months after the date of effectiveness of the management contract. Deliverable 3, 4 and 5 should be submitted 3 – 6 months after that or at any other time that might be deemed more appropriate and agreed upon between the PCU and management during the inception of the management mandate.

**Data, Local Services, Personnel, and Facilities to be Provided to the Consultant**
The consultant shall set up an office at TACV and will have full access to all facilities and resources.

**Institutional Arrangements**



Management shall report directly and accordingly to the members of Government in charge of transport (Minister of Transport and Infrastructure) and privatizations (Minister of Finance and Planning). All deliverables pertaining to this management contract shall be copied to the PCU.

## Confidentiality

The management mandate is being carried out exclusively for the purpose of developing and initiating privatization options for TACV. Accordingly, the consultant will neither discuss with, nor distribute to parties outside TACV, the World Bank, and the PCU, without their explicit authorization, any aspects or details relating to their findings.

## Independence and Impartiality

The consultant must be independent of any member of the board of directors, executive officer or senior manager of TACV or of its shareholder institutions, and of any other airline, which has or intends to establish commercial activities in Cape Verde and/or West Africa. Independence implies that the senior managing partner, other partner, or staff member who would be involved in the management mandate, is neither serving as a director of any of the above mentioned institutions nor has any personal, financial, or close business relationship except as an independent professional advisor of TACV during the course of the management mandate.

## Timetable and Output

The consultant must be prepared to begin work by December 31st, 2006.  The assignment duration is estimated to be between 12 months from inception.

The initial output of the management mandate will be that TACV will receive immediate professional management, which will perform the necessary assessment to lead the airline towards privatization.  Given the fact that several studies about TACV have been completed, that current management has already initiated an internal restructuring program, and that decisive steps towards privatization are most important at the current stage, the expected outcome should not be limited to new studies, but provide concrete implementation results.

Procurement of consulting services will follow the guidelines of the World Bank.
 Proposals will be evaluated by a committee, which will consist of representatives of PCU and the GoCV. Bidding firms or consultants will provide their technical proposal and financial proposal in different envelopes.  The proposals shall be evaluated primarily on technical considerations.

Significant **experience in restructuring projects and proven turnaround management** in airline business are required, whereby experience and market knowledge of countries in the African continent are desirable and of advantage. Ideally the consultant has access to other carriers, facilitating a partnering concept,

and offers contacts to engage into privatization discussions. The **technical proposal** should therefore state the level and experience of the consultants intended for the project and should include their CV's and references of previous restructuring projects in the region.

The **financial proposal** should include a fixed fee (lump sum) and, if applicable, a success fee including a proposal of how this will be measured.

**APPENDIX B—REPORTING REQUIREMENTS**

The Consultant is expected to prepare and submit to the Client electronic versions and three (3) hard copies of the following reports:

1. Assessment of TACV's current operational situation, with focus on:
    a. Corporate structure & human resources management
    b. Finance & controlling
    c. Network management
    d. Revenue management
    e. Product & services
    f. Sales & distribution
    g. Flight & ground operations
2. Market research and strategic development plan
3. Comprehensive five-year business plan
4. List of potential international partners and networks for TACV

Deliverable 1 shall be submitted in draft to the PCU no later than three (3) months after the date of effectiveness of the management contract. Deliverables 2, 3 and 4 should be submitted 6 - 9 months after the date of effectiveness  or any earlier time that might be deemed more appropriate and agreed upon between the PCU and management during the inception of the management mandate.

Additionally:

1. The Consultant shall meet monthly with the Task Force to present progress made in the execution of all areas of the management mandate, and at any other time deemed necessary by the Client;
2. The Consultant shall present monthly financial statements to the Task Force, to allow for the effective monitoring of Contract implementation.

**APPENDIX C—KEY PERSONNEL AND SUBCONSULTANTS**

Refer to Annex  G – technical proposal, pages 47 and 48.

### APPENDIX D—BREAKDOWN OF CONTRACT PRICE IN FOREIGN CURRENCY

*Not used.*

### APPENDIX E—BREAKDOWN OF CONTRACT PRICE IN LOCAL CURRENCY

*Not used.*

### APPENDIX F—SERVICES AND FACILITIES PROVIDED BY THE CLIENT

See Appendix I, numbers 1 – 4.

### APPENDIX G—TECHNICAL PROPOSAL

See attached.

### APPENDIX H—FINANCIAL PROPOSAL

See  attached plus note below.

Note: Given that:

1.  Two years have passed since Sterling's original proposal was made;

2.  Unit labor costs have changed since;

3.  The budget for the management contract is USD 950,490.62 (nine hundred and fifty thousand, four hundred and ninety U.S. Dollars and sixty-two cents),

The contracting parties agree that once TACV's current operational assessment is made, they shall seek to adjust the work plan, to keep to the budgeted amount referred above. Should the assessment reveal requirements in line with the management mandate objectives that go beyond the original plan, the Client may seek additional funds to support agreed upon activities.

### APPENDIX I—



1.  The Client shall grant the Consultant full authority for the execution of the management mandate, as described in Appendix A—Description of Services. The Client shall not interfere in day-to-day operations of the airline, but will closely monitor the execution of the management mandate and provide the Consultant with the support necessary to fully and successfully undertake its assignment.

2.  The Consultant shall have full access to all TACV facilities and documentation. To the extent possible, the Client shall facilitate the Consultant's access to other relevant documents that may facilitate the execution of the management mandate.

3.  All Consultant personnel assigned to the management contract, as provided for in this contract, shall travel TACV free of charge, provided seats are available or reservations have been made in advance.

4.  For the implementation of the restructuring measures agreed upon with the Client after TACV's situation analysis, as provided in the terms of reference, the Consultant shall, in the first instance, use TACV's own financial resources (including lines of credit) and/or seek commercially available financing. Failing that, the Consultant shall seek financing by the Client, in the form of added capital.

5.  **PERFORMANCE INDICATORS** – The performance of the management mandate shall be measured against the following set of indicators:

    a.  **NON-MEASURABLE PERFORMANCE INDICATORS**: Indicators within this category are parameters that will be conceived as conditional variables. These parameters should be accomplished in full, and not subject to a gradual measurement or weighting. This is to say that if these requirements are not fully satisfied, and TACV shareholders have provided the support necessary to implement agreed upon restructuring measures, including financial support as set forth in number 5 above, the contract should not be sustained.

        i.  Safety requirements:

The operation of the airline under the management contract should be in accordance to international standards of safety operations. The International Civil Aviation Organization (ICAO) sets norms and recommendations that are adopted and ratified by the local technical regulator, the Agência da Aeronáutica Civil (AAC, Civil Aviation Agency).

Based on a thorough inspection of the United States' Federal Aviation Administration, AAC has been approved as a world class technical regulator in full compliance with the International Civil Aviation Organisation[2]. Re-certified as Category 1 meant that the AAC is in full compliance with the procedures and processes to guarantee safety,

---

[2] The IASA program certifies based on the compliance of Annexes 1, 6 and 8 to the Chicago Convention of 1944.

according to the ICAO standards. It is a vote of confidence to the technical regulator, and to any certification issued by the institution.

Under local and international norms, an airline should have an **Air Operator Certificate (AOC)** to be able to operate. The AOC is issued by the AAC through a specific certification process. It usually uses a structured safety driven approach to certificate air carriers based on their systems, subsystems, elements and associated specific regulatory requirements. This approach is based on viewing and certifying air carrier systems as an integrated whole, rather than as separate parts.

Holding a valid AOC means that the airline is in full compliance with all the local and international safety requirements. The AAC performs periodic inspections to the airline, in order to assure the full compliance with the AOC specifications.

**Safety is of paramount importance for the Government of Cape Verde. It is therefore imperative that, under the management contract, the airline withholds a valid AOC as a proof of total compliance with all the applicable safety regulations. The lack of compliance with this requirement should be just cause for terminating the agreement.**

TACV is currently seeking full IATA membership. The Consultant shall continue this process in a judicious manner.

**Contract deliverables**

The Consultant's obligations regarding contract deliverables are set forth in Appendices A and B to this Contract ("Description of Services" and "Reporting Requirements"). The strict observation of these obligations is a sine qua non condition for compliance with the present Contract.

MEASURABLE PERFORMANCE INDICATORS

Considering the rationale provided for each, below, these indicators will be measuring the performance of the airline, according to specific objectives. These indicators are measurable in the sense that their compliance is graded, with respect to predefined objectives. They can be achieved partially, and so they should be measured in relative units to the predefined goals. **Specific achievement targets for each of the indicators in this section will be agreed upon by the contracting parties, in the two weeks after submission and approval of the assessment of TACV's current operational situation.**

> → The proposed indicators should not be regarded separately, but as a combined set of variables. It is the combination of them that will measure the efficient performance of the company, according to the objectives of the Government of Cape Verde.

- **Market share gain on selected routes**

*Rationale*

The new management is expected to be able to increase the volume of business by expanding the services against the competition.

The way of measuring that is by monitoring the percent of sold seats in the principal routes, against the other competing airlines serving the same segments.

The indicator should only be linked to three specific point to point routes (direct city pair connections), considered the key generators of value to the company. The routes, to be selected, should be the premium routes of the company, from where greater competition exists, where gaining market share would be a challenge **Two of the routes have already been selected (Sal – Lisbon – Sal and Praia – Dakar – Praia), and a third will be defined after the assessment of the airline is made**

This indicator, if implemented alone, may lead to the manipulation of prices (fares) in order to achieve rapidly a greater share of the market, at the expense of total volume of sales. Demand for air travel, in particular for economy class tickets, is highly elastic to fares. A substantial drop in prices could generate a significant increase in tickets sold, but an overall reduction in revenues.

For this reason, the gain in market share on some of the routes should be jointly regarded with the EBITDA/Sales indicator, according to a formula to be agreed upon.

*Indicator*

⤙ **MSG**: gain in market share in percent terms, measured as the percent difference in the total amount of passengers carried selected scheduled destinations by TACV, from the total traffic to the same destinations.

- **EBITDA / Sales**

*Rationale*

This indicator is aimed to measure the efficiency achieved by the new management in improving the profitability of the airline.

The indicator will measure the Earnings Before Interest, Taxes, Depreciation and Amortisation (EBITDA), to avoid any manipulation of accounting expenses. Profitability will be measured by EBITDA as a function of sales, to measure the efficiency gains by the use of the given resources.



*Indicator*

> → **EOS**: percent increase in earnings on sales, measured as EBITDA divided by total revenues of the same period.

- **Weighted formula for application of the Performance Indicators**

A proposed formula to combine the above mentioned indicators into a weighted performance indicator (WPI) will be defined once specific targets for each indicator are set. The formula will provide a higher value to the EBITDA/sales indicator than the other, given the fact that it is still the most critical indicator for value generation.

### RECOMMENDATION ON LABOR COSTS RESTRUCTURING

*Rationale*

The Government of Cape Verde is firmly committed to improve the efficiency of TACV by eliminating redundant labor and achieving a maximization of the human resources allocated. It is expected that the new management of the company will achieve these objectives by restructuring the labor costs of the company and by rationalizing the workforce. The use of international benchmarks for comparison is key in setting the desirable targets that should be aimed at. Given the financial implications of any labor restructuring measures deemed necessary, which TACV may not be able to auto-finance, the Consultant shall seek appropriate financial arrangements with the Client.



**ANNEX 2:  DEMAND FOR ARBITRATION – ADR SYSTEMS**

**Please select what best describes you: I am...**

◉ a Plaintiff Counsel

◯ a Defense Counsel

◯ an Insurance Company or TPA Representative

◯ a Commercial Business

[ Continue ]

**Enter information about yourself**

* Name        Roger B. Jantio

* Firm/Company   Sterling Merchant Finance Ltd

* Address     1211 Connecticut Avenue, NW

              4th floor

* City        Washington

* State       District of Columbia

* ZIP Code    20036     [format: #####-####]

* Telephone   202-785-3500   [format: 202-785-3500]

Fax   202-785-3505   [format: 202-785-3505]

* Email Address   Rjantio@SterlingUS.com

**Enter information about your case**

* Type of Case   CONTRACT

* Prefered Type of Hearing   ARBITRATION

* Name of the Party you are representing   Sterling Merchant Finance Ltd

Your Reference Number   TACV   [e.g. file number]

Defendant's Reference Number   TACV   [e.g. claim number]

Date of loss or incident   (if applicable) [format: mm-dd-yy]

* At Issue   OTHER

* Have all parties agreed to have this case processed by NAM?

◯ Yes   ◉ No

If planning for an Arbitration, and all parties have agreed to High/Low parameters, enter them here (no commas).

High

Low

\* Is this case in suit?

☐ Yes   ◉ No

**Enter information about the Defendant**

\* Name   Messrs. Julio Fortes and Rui Cardoso

\* Firm/Company Coordination Unit of the Growth and Competitiveness Project

\* Address Avenida Cidade de Lisboa, Prédio "Bô Casa", 4th floor

P.O. Box 323

\* City   Praia, CAPE VERDE

\* State

\* ZIP Code   [format: #####-####]

\* Telephone   (238)   [format: 011 238 261-4748 / 261-2318 / 260-1020]

Fax   (238)   [format: 011 238 261 2334]

Email Address   jfortes@ucp.gov.cv

\* Name of the party Defendant is representing Ministry of Economy, Growth and Competitiveness of the Republic of Cape Verde

**If the Defendant will be represented by Counsel, please enter Counsel information**

\* Name

\* Firm/Company

\* Address

\* City

\* State

\* ZIP Code   [format: #####-####]

\* Telephone   [format: ###-###-####]

Fax   [format: ###-###-####]

Email Address

Counsel's Reference Number   [e.g. file number]

Please provide us with any additional information which might help us in setting up your case. (e.g. any additional parties, when and where you are available for the hearing, or

Claimant seeks to have (i) all outstanding invoices paid namely Invoice No. RBJ/pd/372 dated November 20, 2007 for $190,098.12 and the balance on Invoice No.  RBJ/pd/383 (REV) dated September 10, 2008 for $39,897.00 and (ii) all litigation cost incurred from the arbitration case brought against the Claimant by the former CEO of TACV because the respondant has not made timely payment of the management fees of TACV. These litigation cost represents $35,125.00 (arbitration fees by the Claimant, arbitration fees to be paid to the former CEO, Claimant legal fees, or a total claim amount of $265,114.12 plus interest based on prime interest rate of the Central Bank of Cape Verde plus 2 percent. Claimant is available for the oral hearing to be scheduled in Washington, DC.

nature of case)

**ANNEX 3:  DEMAND FOR ARBITRATION – ICDR**

 **International Centre for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

June 8, 2012

**Via Email Only**

Sir Roger B. Jantio
Sterling Merchant Finance Ltd
1211 Connecticut Avenue
4th floor
Washington, DC  20036

**Via Email Only**

Julio Fortes
Growth and Competitiveness Project
Avenida Cidade de Lisboa
P.O. Box 323
Praia
Cape Verdes

Cristina Duartes
Ministry of Finance, Planning and Regional Development
Avenida Amilcar Cabral 107
P.O. Box 30
Praia
Cape Verdes

Re: 50 148 T 00424 12
    Sterling Merchant Finance Ltd.
    vs
    Growth and Competitiveness Project and Ministry of
    Finance, Planning and Regional Development

Dear Parties,

The International Centre for Dispute Resolution (ICDR), a division of the American Arbitration Association (AAA), acknowledges receipt of a Notice of Arbitration dated June 5, 2012 for a dispute arising out of a contract between the above-captioned parties. A copy should have been sent to Respondents.

Please be advised that the above-captioned parties are receiving this communication in accordance with the representative information provided to us by Claimant. If you are receiving this communication and do not represent any of the parties in this matter, please contact the ICDR immediately.

*A Division of the American Arbitration Association*

We have reviewed Claimant's documents and in particular No. 7.2 of the *Special Conditions of Contract*. The clause appears not to provide the ICDR with the authority to administer this matter. As such, we can only proceed if also Respondent would agree to us administering this matter. The necessary Submission to Dispute Resolution form can be found on our website at http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_004346.

In case the Parties may agree to ICDR administration, please execute said form (counterparts are acceptable) and return the same to the ICDR. Please note that if the Parties can not agree to ICDR administration by **June 29, 2012**, we will automatically close this matter and delete all documents received to day in a secure way.

Please do not hesitate to contact me at any time via email or phone should you have any questions.

Sincerely,

Christian Alberti, LL.M.
Attorney-at-Law, Germany & NY
Assistant Vice President
212-484-4037
AlbertiC@adr.org

**From:** Christian Alberti [Albertic@adr.org]
**Sent:** Wednesday, October 17, 2012 11:11 AM
**To:** 'Rjantio@SterlingUS.com'
**Subject:** Sterling Merchant Finance Ltd v. Growth and Competitiveness Project and Ministry of, Finance, Planning and Regional Development (ICDR case no. 50 148 T 00424 12)

Dear Sir Roger,

It was a pleasure speaking with you today.

As discussed over the phone, we still have not heard back from Respondent and are at a juncture where we would have to close this matter due to lack of administrative authority. But we are happy to give it another try and reach out to Respondent via email, fax, mail, UPS and/or FedEx. Thank you very much for agreeing to cover the expenses for the latter approach.

Please be so kind to verify that the contact details we should use for Respondent are as follows:

       **Growth and Competitiveness Project**
       c/o Julio Fortes
       Avenida Cidade de Lisboa
       P.O. Box 323
       Praia
       Cape Verdes
       Fax: 011-238-261-2334
       Email: Julio.Fortes@minfin.gov.cv

       **Ministry of Finance, Planning and Regional Development**
       c/o Cristina Duartes
       Avenida Amilcar Cabral 107
       P.O. Box 30
       Praia
       Cape Verdes
       Email: jessica.sanche@minf.gov.cv; pedrina.silva@minf.gov.cv (please note that the email to jessica.sanche@minf.gov.cv bounced back)

We will set a deadline for the end of this month (October 31, 2012) asking Respondent to advise whether the ICDR, as the neutral administrative body, is acceptable. Absent any agreement by said date we would unfortunately have to close this matter as we would then have no administrative power over this matter.

If you have any questions or concerns, please do not hesitate to contact me at any time via phone or email.

Best regards,

**Christian P. Alberti, LL.M.**
**Attorney-at-Law, Germany & NY**
**Assistant Vice President**
International Centre for Dispute Resolution®
A Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019
Tel: +1 212.484.4037
Fax: +1 212.246.7274
Web: www.icdr.org

**Register Now:**

**An ICDR & Chamber of Commerce of Bogota, Colombia**
**Joint International Arbitration Conference**

**October 23, 2012**

To register visit: https://www.aaau.org/courses
or contact Jason Cabrera at +1.212.484.3207 or by email cabreraj@adr.org.

Courses Customer Service: +1.212.716.3977 or e-mail at aaauniversity@adr.org.

**Save the Date:**

**4th Annual ICDR & AMCHAM of Sao Paulo, Brazil**
**Joint International Arbitration Conference**
**November 29, 2012**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal.

Thank you.

**ANNEX 4:  SELECTED LETTERS TO GOVERNMENT OF
CAPE VERDE OFFICIALS**



# Sterling Merchant Finance Ltd
*Merchant Bankers*

July 17, 2013

**The Office of the Senior Managing Director**

H.E. José Maria Pereira Neves
Prime Minister
Palácio do Governo
Várzea Cidade da Praia
Ilha de Santiago 304
Cabo Verde

His Excellency Mr. Prime Minister,

     **RE:** Management contract of TACV – Cabo Verde Airlines

I have the honor of writing to follow up on the letter I sent to you last April 30, 2013 to call your attention on the sizable unpaid invoice that my company has been left holding following the dedicated human and financial effort we put forth when we were granted the management contract of TACV.

You had been kind to forward our petition to your adviser Mr. Abdul Hay Kaunda Simas with whom we have occasionally been in touch. We have also had the honor of meeting the competent Ambassador of Cape Verde to Washington to explain to her the validity of our claim and our commitment to seeing a fair and respectful resolution of the dispute. We have also conveyed our concern to the representatives of the executive and legislative branches of the United States Government.

We are not happy to be taking all these initiaves and would much rather have the opportunity to amicably resolve our claim. We are also not looking forward to the proceedings at the Permanent Court since our repetitive demands for arbitration went unanswered.

We are respectfully calling on you again to help put the resolution of our claim on the path of amicability as I am confident that both Sterling Merchant Finance Ltd and the Government of Cape Verde have much more to gain working together for their mutual benefits.

I have the honor of remaining,

Yours sincerely,

Sir Roger B. JANTIO
Senior Managing Director & CEO
STERLING MERCHANT FINANCE LTD

Chairman & Managing Partner
CONDONA CAPITAL LLC

**One Lafayette Center, North Tower**
**1120 20th Street, NW, 7th Floor, Washington DC 20036**
**Tel. (202) 785-3500  Fax. (202) 785-3505  E-mail: Rjantio@SterlingUS.com**
**Website: http://www.SterlingUS.com**



**Sterling Merchant Finance Ltd**
*Merchant Bankers*

August 30, 2013

**The Office of the Senior Managing Director**

His Excellency Mr. José Maria Pereira Neves
Prime Minister
Palácio do Governo
Várzea Cidade da Praia
Cabo Verde

His Excellency Mr. Prime Minister,

      **RE:** Demand for arbitration on the management contract of TACV

I trust you are well and that you have had a restful summer recess. I have the honor of writing to follow up on the letters I sent to you on April 30 and July 1, 2013 to call your attention on the sizable unpaid invoice that my company has been left holding following the dedicated human and financial effort we put forth when we were granted the management contract of TACV.

I have hoped that by now we would have received a response. As I mentioned to you in my previous letters, Article 7.2 of the contract called for the arbitration in accordance with the UNCITRAL Arbitration Rules ("the Rules") as the conflict resolution mechanism for any dispute, controversy, or claim arising out of or relating to the contract, or the breach, termination, or invalidity thereof. The demands for arbitration we filed on October 6, 2010 and on June 18, 2012, in addition to over 45 letters written to various Government authorities calling for an amicable resolution failed to receive any response.

Having exhausted all recourses and complied with the requirements for a Notice of Arbitration set out in Article 3 of the Rules, I write out of respect to you and out of my love to your country to inform you that with much regret, we have decided to ask the Secretary General of the Permanent Court of Arbitration ("PCA") to designate an appointing authority. Indeed, the Rules entrust to the Secretary General of PCA the role of designating an arbitration appointment authority, notwithstanding the Government of Cape Verde's silence and seems to be tantamount to 'bad faith'. As per Articles 6 and 7 of the Rules, the Government's silence will not prevent the appointing authority from designating an arbitrator who will finally bring this sad case to a full resolution.

I have the honor of remaining,

Yours sincerely,

Sir Roger B. JANTIO
Senior Managing Director & CEO
STERLING MERCHANT FINANCE LTD
&
Chairman & Managing Partner
CONDONA CAPITAL LLC

**One Lafayette Center, North Tower**
**1120 20th Street, NW, 7th Floor, Washington DC 20036**
**Tel. (202) 785-3500  Fax. (202) 785-3505  E-mail: Rjantio@SterlingUS.com**
**Website: http://www.SterlingUS.com**

**Copies:**

- Her Excellency Mrs. Cristina Duarte, Minister of Finance, Planning and Development
- Her Excellency Mrs. Sara Maria Duarte Lopes, Minister of Infrastructure and Maritime Economy
- His Excellency Mr. Jorge Borges, Minister of Foreign Relations
- Her Excellency Mrs. Maria Fatima Lima de Veiga, Ambassador of Cape Verde to the U.S.
- Honorable Ed Royce, Chairman of the U.S. House Committee on Foreign Affairs
- Honorable Adrienne S. O'Neal, U.S. Ambassador to Cape Verde
- Mr. João Pereira Silva, Chief Executive Officer of TACV
- The Count Charles-Hubert de Girondiac d'Issy, Attorney
- Board of Directors, SMFL



# Sterling Merchant Finance Ltd
*Merchant Bankers*

August 30, 2013

**The Office of the Senior Managing Director**

The Secretary-General
Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ  The Hague
The Netherlands

Dear Mr. Secretary General,

    **RE:** Designation of an Appointing Authority on the Arbitration between Sterling Merchant Finance Ltd v. Government of Cape Verde in relation to management contract for TACV

I write in accordance with the UNCITRAL Arbitration Rules which entrust to you the role of designating an "appointing authority" and in my role as the representative to a party to arbitration between Sterling Merchant Finance Ltd and the Government of Cape Verde.

On October 6, 2010 and June 18, 2012, we filed for demands for arbitration in accordance to Art. 7.2 of the contract to manage and privatize TACV-Cabo Verde Airlines, which called for arbitration as the conflict resolution mechanism in accordance with the UNCITRAL Arbitration Rules ("the Rules"). We complied with the requirements for a Notice of Arbitration set out in Article 3 of the 1976 Rules. Each time the respondent refused to respond.

Since no appointing authority has been previously designated by the parties in the contract and the parties have not reached an agreement on an appointing authority within 30 days following our proposal to appoint ADR System and later International Center for Dispute Resolution (ICDR), I would like to request that you please designate the appointing authority in accordance with Article 6, para.2 of the Rules, 2010).

We are accompanying our request with the following:

- A copy of the contract with the arbitration clause establishing the applicability of the UNCITRAL Arbitration Rules;
- A copy of the Notice of Arbitration served upon the respondent, as well as the date of such service;
- A copy of a revised demand for arbitration adjusting our claim to **US\$616,921.51**, covering our original claim, interest, legal costs and collection costs.

**One Lafayette Center, North Tower**
**1120 20th Street, NW, 7th Floor, Washington DC 20036**
**Tel. (202) 785-3500  Fax. (202) 785-3505  E-mail: Rjantio@SterlingUS.com**
**Website: http://www.SterlingUS.com**

- A memorandum outlining the names of institutions we proposed as appointing authority which has;
- A power of attorney evidencing the authority of the person making the request; and
- Copy of the transfer order for the non-refundable administrative fee.

Please do not hesitate to contact me if you have any question.

Yours sincerely,

Sir Roger B. JANTIO
Senior Managing Director & CEO
STERLING MERCHANT FINANCE LTD

**ANNEX 5: CONSOLIDATED INVOICE AS OF
SEPTEMBER 1, 2013**



**Sterling Merchant Finance Ltd**
*Merchant Bankers*
*Banquiers d'Affaires*

## INVOICE

| | | | |
|---|---|---|---|
| **Date:** | September 1, 2013 | | **Ref. Number: RBJ/pd/374 LEGAL** |

| **TO:** | **Government of CAPE VERDE** | **FROM:** | **Sterling Merchant Finance Limited** |
|---|---|---|---|
| Address | Ministry of Finance c/o Growth & Competitiveness Pr. P.O. Box 323 Praia, CAPE VERDE | Address: | 1120 20th Street, NW, 7th Floor Washington, DC 20036 UNITED STATES OF AMERICA |

**Reference:**     **Consultants' services for the management and privatization of TACV**

| DESCRIPTION | Amount (US$) |
|---|---|
| ❖ Twenty (20) percent of the lump-sum upon submission of management performance report (Invoice $N_0$ RBJ/PS/373 dated November 20th 2007). | $190,098.12 |
| ❖ Balance on Invoice $N_0$ RBJ/pd/383 (dated September 10th, 2008) | $39,897.00 |
| ❖ Litigations costs – Arbitration case at AAA/ICDR and case at the Washington DC District Superior case brought by the former CEO of TACV (dated September 10th, 2008) | $35,125.00 |
| ❖ Interest rate based on the discounted rate of the Central Bank of Cape Verde + 2 percent | $216,801.39 |
| ❖ Collection fees | $135,000.00 |
| ◆ **TOTAL** | **US$616,921.51** |

We confirm Six hundred sixteen thousand nine hundred twenty one US dollars and Fifty one cents.
Please kindly transfer the above-stated amount of the present invoice to the following bank account number:

| | |
|---|---|
| Name of the bank: | **UBS AG** |
| Address: | 677 Washington Blvd, Stamford, CT 06901 (USA) |
| SWIFT: | UBSWUS33 |
| Account Number: | 101WA25864000 UBS Financial Services for final credit to |
| | Sterling, Sub Account № AEC0873 |

Roger B. Jantio
Senior Managing Director

**1120 20th Street, NW, 7th Floor, Washington, D.C. 20006**
**Tel (202) 785-3500   Fax (202) 785-3505**
**E-mail: Sterling@SterlingUS.com, http://www.SterlingUS.com**

**ANNEX 7: PROOF OF WIRED TRANSFER**

# POWER OF ATTORNEY

This power of attorney is given on this 1st *day of July, 2014*, by the Chairman of the Board of Sterling Merchant Finance Ltd, located at 1850 M Street, NW, Suite 920, *Washington, DC 20036, United States*, to Roger Jantio, Senior Managing Director and CEO, who may act separately to represent the company on the arbitration case and the request for the designation of an appointing authority by the Permanent Court of Arbitration.

Signature of Donor: *R.Blanchard Jantio*

Name of Donor:      R.Blanchard Jantio
                    Chairman of the Board of Director

---

**NOTARY PUBLIC:** District of Columbia
*Subscribed and sworn to before me this* _July 1st, 2014_

*Notary Public*
My commission expires: _nov 14, 2016_

MARILYN ROZARIO
District of Columbia Notary Public
My Commission Expires November 14, 2016

**ANNEX 7: PROOF OF WIRED TRANSFER**

 **UBS**

**UBS Financial Services Inc.**
1000 Harbor Boulevard
C-925
Weehawken NJ 07086

ubs.com/fs

**Confirmation**

**Your Financial Advisor**
PAUL A. DAMIBA
212-649-7575/800-566-2086

**Send checks/correspondence to:**
UBS FINANCIAL SERVICES INC.
1285 Avenue Of Americas
New York NY 10019

STERLING MERCHANT  FINANCE LTD
11313 WALNUT CREEK COURT
OAKTON VA 22124-2044

July 01, 2014

# We confirm the following transaction

Please review carefully and retain this confirmation for your records. If you did not
authorize a transaction, please contact us at 201-352-7627.

**Foreign Currency Wire**

| PAYEE: | | | Amount paid (USD) | $1,029.23 |
|---|---|---|---|---|
| Permanent Court of Arbiration | Account debited | | | |
| ING BANK N.V. | Transaction date | 07/03/14 | Exchange rate | 1.372300 |
| ACCT NO. **** **** 8438 | | | NET amt debited (EUR) | **750.00** |

*PURPOSE: Other:DESIGNATION OF AN APPOINTING AUTHORITY PURSUANT TO THE
UNCITRAL ARBITRATION*

*This payee will be added as an Approved Payee. Please see note on page 1.*

**Approved Payees**
*Where indicated, as a convenience to you, we will retain the payment instructions for
payees indicated and after 60 days, we will consider them "Approved Payees" unless
you notify us otherwise. This means, for these payees, you will no longer receive
separate confirmations for each payment or transfer that follows these instructions, even
if you alter the amount. All payments and transfers to and from your account will continue
to be reflected on your account statements, which you should review carefully.*

*We will not require letters of authorization for future payments and transfers to your
Approved Payees.*

*We will continue sending separate confirmations for all payments and transfers that are
not associated with an Approved Payee or that involve a different type of
payment/transfer or different accounts.*

*If you wish to remove Approved Payees, please contact your Financial Advisor.*

**Questions**
*If you have any questions, please contact your Financial Advisor, PAUL A. DAMIBA, at
212-649-7575/800-566-2086.*

*Thank you for allowing us to serve your wealth management needs.*

UBS Financial Services Inc. is an indirect subsidiary of UBS AG and an affiliate of UBS Securities LLC.

D01 1 040928 00030862 03046566300 0 0001E

Page 1 of 1