# EXHIBIT E

## CERTIFIED COPY OF ARBITRAL AWARD

## Dated 27 November 2015

IN THE MATTER OF AN ARBITRATION

between

STERLING MERCHANT FINANCE LTD

(Claimant)

and

THE GOVERNMENT OF THE REPUBLIC OF CABO VERDE

(Respondent)

PCA Case No. 2014-33

---

# AWARD

---

*Sole Arbitrator*
Professor Juan Fernández-Armesto

*Arbitral Secretary*
Mr. Rafael Bittencourt Silva

*Registry*
Permanent Court of Arbitration

Date: 27 November 2015

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... 2

GLOSSARY OF TERMS AND ABBREVIATIONS ................................................ 4

I.    THE PARTIES TO THE ARBITRATION ................................................... 7
      I.1.   THE CLAIMANT – STERLING MERCHANT FINANCE LTD          7
      I.2.   THE RESPONDENT – THE GOVERNMENT OF CABO VERDE       7
      I.3.   THE PERMANENT COURT OF ARBITRATION                   9
      I.4.   THE SOLE ARBITRATOR                                   9
      I.5.   THE ARBITRAL SECRETARY                                9

II.   PROCEDURAL HISTORY ............................................................................. 11
      II.1.  THE ARBITRATION CLAUSE                               11
      II.2.  THE DESIGNATION OF AN APPOINTING AUTHORITY          11
      II.3.  THE APPOINTMENT OF THE SOLE ARBITRATOR             12
      II.4.  TERMS OF APPOINTMENT                                12
      II.5.  PROCEDURAL ORDER NO. 1: PLACE, LANGUAGE AND CALENDAR   13
      II.6.  APPLICABLE LAW                                      13
             1.   THE PARTIES' POSITIONS ....................................................... 14
             2.   THE SOLE ARBITRATOR'S DECISION ............................................. 14
      II.7.  THE PARTIES' SUBMISSIONS AND CLOSING OF THE PROCEEDINGS   15
      II.8.  THE SUBMISSION OF NEW DOCUMENTS WITH THE C SR      15
             1.   THE RESPONDENT'S MOTION ....................................................... 16
             2.   THE SOLE ARBITRATOR'S DECISION ............................................. 16

III.  FACTS ............................................................................................................... 18
      III.1. BACKGROUND TO THE CONTRACT                          18
      III.2. THE CONTRACT                                         20
      III.3. THE PERFORMANCE OF THE CONTRACT                     23
      III.4. ALLEGED EXTENSIONS OF THE CONTRACT                  24
      III.5. POST-CONTRACTUAL EVENTS                             25

IV.   RELIEF SOUGHT BY THE PARTIES .......................................................... 28
      IV.1. THE CLAIMANT'S REQUEST FOR RELIEF                    28
      IV.2. THE RESPONDENT'S REQUEST FOR RELIEF                  28

V.    ISSUES TO BE DETERMINED ............................................................................ 30

VI.   DISCUSSION ON THE MERITS OF THE CLAIM ................................................ 31
      VI.1. FIRST ISSUE – NON-PAYMENT OF THE SIXTH INVOICE                               31
            1.   THE CLAIMANT'S POSITION........................................................... 31
            2.   THE RESPONDENT'S POSITION...................................................... 32
            3.   THE SOLE ARBITRATOR'S DECISION............................................. 34
      VI.2. SECOND ISSUE – PAYMENT OF THE FINAL INVOICE                                  44
            1.   THE CLAIMANT'S POSITION........................................................... 44
            2.   THE RESPONDENT'S POSITION...................................................... 44
            3.   THE SOLE ARBITRATOR'S DECISION............................................. 45
      VI.3. THIRD ISSUE – ARBITRATION COSTS IN THE CEO'S CASE                            46
            1.   THE CLAIMANT'S POSITION........................................................... 46
            2.   THE RESPONDENT'S POSITION...................................................... 47
            3.   THE SOLE ARBITRATOR'S DECISION............................................. 48
      VI.4. FOURTH ISSUE – THE CLAIMANT'S LOSS OF BUSINESS OPPORTUNITIES        49
            1.   THE CLAIMANT'S POSITION........................................................... 49
            2.   THE RESPONDENT'S POSITION...................................................... 50
            3.   THE SOLE ARBITRATOR'S DECISION............................................. 50
      VI.5. FIFTH ISSUE – THE CLAIMANT'S COLLECTION COSTS                                51
            1.   THE CLAIMANT'S POSITION........................................................... 51
            2.   THE RESPONDENT'S POSITION...................................................... 52
            3.   THE SOLE ARBITRATOR'S DECISION............................................. 52

VII.  INTEREST ...................................................................................................... 54
      VII.1.   THE CLAIMANT'S POSITION                                                   54
      VII.2.   THE RESPONDENT'S POSITION                                                 55
      VII.3.   THE SOLE ARBITRATOR'S DECISION                                            55

VIII. COSTS ............................................................................................................ 58
      VIII.1.  THE CLAIMANT'S POSITION                                                   58
      VIII.2.  THE RESPONDENT'S POSITION                                                 58
      VIII.3.  THE SOLE ARBITRATOR'S DECISION                                            59

IX.   DECISION ...................................................................................................... 63

## GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **AOC** | Air Operator Certificate |
| **Art.** | Article |
| **C** | Claimant or Sterling Merchant Finance Ltd |
| **C SC** | Claimant's Statement of Claim |
| **C SR** | Claimant's Statement of Reply |
| **C St. C.** | Claimant's Statement on Costs |
| **C WS X** | Claimant's Witness Statement n° X |
| **Claimant/Sterling** | Sterling Merchant Finance Ltd |
| **Communication A X** | Sole Arbitrator's communications to the Parties |
| **Contract** | Management of TACV Contract between the Growth and Competitiveness Project and Sterling Merchant Finance Ltd of 30 October 2006 (Doc C 1) |
| **Contract Price** | The price to be paid for the Services provided under the Contract |
| **Doc C X** | Documentary evidence presented by the Claimant |
| **Doc R X** | Documentary evidence presented by the Respondent |
| **Doc CLA X** | Legal authorities presented by the Claimant |
| **Doc RLA X** | Legal authorities presented by the Respondent |
| **Draft Management Report** | Draft of the Final Management Report, submitted by the Claimant in August 2008 (Doc C 12) |
| **EUR** | Euro |
| **Final Invoice** | Invoice No. RBJ/pd383, dated 10 September 2008 (Doc C 19) |
| **Final Management Report** | Management Report submitted by the Claimant on 18 November 2008 |
| **First Amendment** | First Amendment to the Contract, extending its validity for two additional months (Doc C 14) |
| **fn.** | Footnote |

PCA Case No. 2014-33
Award

| | |
|---|---|
| **IBA Guidelines** | IBA Guidelines on Party Representation, adopted by resolution of the International Bar Association Council on 25 Mary 2013 |
| **ICDR** | International Centre for Dispute Resolution |
| **IDA** | World Bank's International Development Association |
| **p.** | Page |
| **para.** | Paragraph |
| **Parties** | The Claimant and the Respondent |
| **PCA** | Permanent Court of Arbitration |
| **R** | Respondent or the Republic of Cabo Verde |
| **R SD** | Respondent's Statement of Defence |
| **R SR** | Respondent's Statement of Rejoinder |
| **R St. C.** | Respondent's Statement on Costs |
| **R WS X** | Respondent's Witness Statement n° X |
| **Respondent/Cabo Verde** | The Republic of Cabo Verde |
| **PCU** | The Growth and Competitiveness Project Coordination Unit |
| **Second Amendment** | Second Amendment to the Contract, extending its validity for three months (Doc C 15) |
| **Sixth Invoice** | Invoice No. RBJ/pd/372, dated 30 November 2007 (Doc C 13) |
| **Special Conditions** | The Contract's Special Conditions |
| **Sole Arbitrator** | The Sole Arbitrator deciding on the present dispute |
| **TACV** | TACV (*Transportes Aéreos de Cabo Verde*) - Cabo Verde Airlines |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 2010 |
| **USD** | United States dollar |

| **1976 Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |

PCA Case No. 2014-33
Award

## I.   THE PARTIES TO THE ARBITRATION

### I.1.   THE CLAIMANT – STERLING MERCHANT FINANCE LTD

1.   The Claimant is STERLING MERCHANT FINANCE LTD [**"Claimant"** or **"Sterling"**], a company registered in Delaware, United States of America. The Claimant's contact details are as follows:

> 1850 M Street, NW
> Suite 920
> Washington, D.C. 20036
> United States of America
> Attn.: Sir Roger B. Jantio
> Tel.: + 1 202 785 3500 (main)
> Tel.: + 1 202 785 9020 (direct)
> Fax: + 1 202 955 5530 / + 1 202 785 3505
> E-mail:   rjantio@sterlingus.com

2.   The Claimant is an investment banking, private equity and international consulting firm, based in Washington, D.C.; its main business is to provide expert advisory services in business strategy, project management, privatisations and merger and acquisition transactions in Africa and other emerging markets. The firm provides advisory services on a wide variety of development projects throughout Asia, Eastern Europe and Africa since 1989[1].

3.   The Claimant is represented in this arbitration by:

> **MATRIX CHAMBERS**
> Mr. Luis González García
> Griffin Building,
> Gray's Inn
> London, WC1R 5LN
> United Kingdom
> Tel.: +44 20 7404 3447
> E-mail:   luisgonzalez@matrixlaw.co.uk

### I.2.   THE RESPONDENT – THE GOVERNMENT OF CABO VERDE

4.   The Respondent is the GOVERNMENT OF THE REPUBLIC OF CABO VERDE [**"Respondent"** or **"Cabo Verde"**]. Its contact details are as follows:

> **H.E. José Maria Pereira Neves**
> **Prime Minister**
> Palácio do Governo
> Várzea Cidade da Praia

---

[1] C SC, para. 5; R SD, para. 3.1.

Ilha de Santiago 304
Republic of Cabo Verde
E-mail:   edna.moreno@palgov.gov.cv

**H.E. Ms. Cristina Duarte**
**Ministry of Finance, Planning and Regional Development**
Attn.: Mr. Rui Jorge de Melo Araújo, Legal Counsel
Avenida Amilcar Cabral 107
P.O. Box 30
Praia, Santiago
Republic of Cabo Verde
Tel.: +238 260 7507
Fax: +238 260 7507
E-mail:   rui.araujo@minfin.gov.cv
          cristina.duarte@minfin.gov.cv
          roxane.pina@minfin.gov.cv
          pedrina.silva@minfin.gov.cv

**Ministry of Infrastructure & Maritime Economy**
c/o H.E. Dr. Sara Lopes
Ponta Belem
Praia,
Republic of Cabo Verde
Tel.: +238 261 5699
E-mail:   sara.lopes@miem.gov.cv

**Growth and Competitiveness Project**
Ministry of Economy, Growth and
Competitiveness
c/o Mr. Julio Fortes
Avenida Cidade de Lisboa
P.O. Box 323
Praia
Republic of Cabo Verde
E-mail:   julio.fortes@minfin.gov.cv
          jfortes@ucp.gov.cv

5.    The Respondent is represented in this arbitration by:

      **MIRANDA CORREIA AMENDOEIRA & ASSOCIADOS**
      Ms. Sofia Martins
      Av. Engenheiro Duarte Pacheco, 7
      1070-100 Lisbon
      Portugal
      Tel.: + 351 21 781 48 00
      Fax: + 351 21 781 48 02
      E-mail:   sofia.martins@mirandalawfirm.com

6.    The Claimant and the Respondent will be referred to as the **"Parties"**.

PCA Case No. 2014-33
Award

### I.3.   THE PERMANENT COURT OF ARBITRATION

7.   By letters dated 7 and 24 October 2014 from the Respondent and the Claimant, respectively, the Parties agreed that the Secretary-General of the Permanent Court of Arbitration ["PCA"] act as appointing authority in this matter

8.   The Terms of Appointment dated 11 February 2014 provide that the PCA act as registry and administer the arbitral proceedings.

9.   The contact details of the PCA's Registry are as follows:

> **Permanent Court of Arbitration**
> Attn: Ms. Evgeniya Goriatcheva, Legal Counsel
> Peace Palace
> Carnegieplein 2
> 2517 KJ, The Hague
> The Netherlands
> Tel.: +31 70 302 4175
> Fax: +31 70 302 4167
> E-mail:   egoriatcheva@pca-cpa.org
>                lgarat@pca-cpa.org

### I.4.   THE SOLE ARBITRATOR

10.   On 12 January 2015, pursuant to the 1976 UNCITRAL Arbitration Rules [the "**1976 Rules**"], Mr. Juan Fernández-Armesto was formally appointed as Sole Arbitrator by the Secretary-General of the PCA[2]. The Sole Arbitrator's contact details are as follows:

> **Mr. Juan Fernández-Armesto**
> **Armesto & Asociados**
> General Pardiñas, 102
> 28006 Madrid
> Spain
> Tel: +34 91 562 16 25
> Fax: +34 91 515 91 4
> E-mail:   jfa@jfarmesto.com

### I.5.   THE ARBITRAL SECRETARY

11.   On 16 January 2015, the Sole Arbitrator proposed that Mr. Rafael Bittencourt Silva act as Arbitral Secretary[3]. The Parties agreed to Mr. Bittencourt Silva's nomination,

---

[2] PCA's letter, dated 12 January 2015.
[3] PCA's letter, dated 16 January 2015.

PCA Case No. 2014-33
Award

the Claimant by letter of 30 January 2015 and the Respondent by letter of 2 February 2015.

12. Mr. Bittencourt Silva's details are as follows:

> **Mr. Rafael Bittencourt Silva**
> **Armesto & Asociados**
> General Pardiñas, 102
> 28006 Madrid
> Spain
> Tel: +34 91 562 16 25
> E-mail:   rbs@jfarmesto.com

PCA Case No. 2014-33
Award

## II.   PROCEDURAL HISTORY

13.   The present dispute arose out of a contract dated 30 October 2006, according to which the Claimant would manage and assist the Government of Cabo Verde[4] in the restructuring and privatisation of TACV – Cabo Verde Airlines ["TACV"], an international passenger airline majority-owned by the Respondent [the "**Contract**"].

### II.1.   THE ARBITRATION CLAUSE

14.   Section 7 of the Contract's General Conditions[5] reads as follows:

> "7.1 Amicable Settlement. The Parties shall use their best efforts to settle amicably all disputes arising out of or in connection with this Contract or its interpretation.
>
> 7.2 Dispute Settlement. Any dispute between the Parties as to matters arising pursuant to this Contract that cannot be settled amicably within thirty (30) days after receipt by one of the other Party's request for such amicable settlement may be submitted by either Party for settlement in accordance with the provisions specified in the [Special Conditions]".

15.   Pursuant to Article 7.2 of the Contract's Special Conditions[6]:

> "Any dispute, controversy, or claim arising out of or relating to this contract, or the breach, termination, or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force".

### II.2.   THE DESIGNATION OF AN APPOINTING AUTHORITY

16.   On 3 July 2014, the Claimant wrote to the PCA requesting that the Secretary-General of the PCA designate an appointing authority in the Claimant's dispute with the Respondent [the "**Request**"][7]. On 9 July 2014, the PCA invited the Claimant to provide additional information and documents regarding the dispute and informed the Claimant that it would proceed in accordance with the 1976 Rules, unless the Claimant made a reasoned request for the application of the 2010 UNCITRAL Arbitration Rules [the "**UNCITRAL Rules**"].

17.   On 11 July 2014 the Claimant submitted a Revised Notice of Arbitration, proposing that the Secretary-General of the PCA designate the International Centre for

---

[4] Strictly, the Claimant's counterparty in the Contract was "The Growth and Competitiveness Project"; neither party, however, has questioned that the only entity with legal personality to act as counterparty in this arbitration is the Government of Cabo Verde.

[5] Doc C 1.

[6] Doc C 1.

[7] PCA's letter, dated 9 July 2014.

Dispute Resolution ["ICDR"] as the appointing authority[8] and that a sole arbitrator be appointed. On 17 September 2014 the PCA invited the Respondent to comment on the Request[9]. The Respondent replied on 7 October 2014, expressing its preference that the PCA directly appoint an arbitrator[10]. On 23 October 2014 the Claimant agreed that the Secretary-General of the PCA act as the appointing authority in the matter[11].

### II.3. THE APPOINTMENT OF THE SOLE ARBITRATOR

18. On 24 October and 3 November 2014 the Claimant and the Respondent, respectively, agreed to the appointment of a sole arbitrator[12].

19. Given the preference expressed by the Claimant for the appointment of the sole arbitrator using the list procedure provided for in Article 6(3) of the 1976 Rules[13] and the Respondent's non-objection[14], on 19 December 2014 the PCA circulated a list containing the names of three prospective sole arbitrators and requested that the Parties return the list after having deleted the name or names to which they objected and numbered the remaining names in the order of their preference[15].

20. After the Parties returned the list of prospective arbitrators with comments, the Secretary-General of the PCA, having established his competence to appoint the sole arbitrator, formally appointed Professor Juan Fernández-Armesto as Sole Arbitrator, by letter dated 12 January 2015[16].

### II.4. TERMS OF APPOINTMENT

21. On 16 January 2015 the PCA, on behalf of the Sole Arbitrator, submitted a draft of the Terms of Appointment to the Parties for their review.

22. By letter of 16 January 2015 the Sole Arbitrator suggested that the Parties agree on the application of the UNCITRAL Rules, instead of the 1976 Rules, which would otherwise have applied pursuant to Article 7.2 of the Special Conditions of the Contract.

23. On 30 January and 2 February 2015 the Claimant and the Respondent, respectively, presented their comments to the draft Terms of Appointment. The Parties disagreed

---

[8] Claimant's letter to the PCA, dated 1 September 2014.
[9] PCA's letter, dated 17 September 2014.
[10] Respondent's letter to the PCA, dated 7 October 2014.
[11] Claimant's letter to the PCA, dated 23 October 2014.
[12] Claimant's letter, dated 24 October 2014; Respondent's letter, dated 3 November 2014.
[13] Claimant's letter, dated 10 November 2014.
[14] Respondent's letter, dated 11 November 2014.
[15] PCA's letter, dated 19 December 2014.
[16] PCA's letter, dated 12 January 2015.

PCA Case No. 2014-33
Award

on several procedural issues, but agreed on the application of the UNCITRAL Rules.

24. In communication A 1, dated 13 February 2015, the Sole Arbitrator circulated and invited the Parties to sign the final version of the Terms of Appointment. The Parties were also requested to present arguments regarding the governing law of the Contract and final comments on the place and language of the arbitration[17].

25. On 21 and 25 February 2015 the Claimant and the Respondent, respectively, signed the Terms of Appointment.

26. On 25 February 2015 the Parties presented their views regarding the governing law.

## II.5. PROCEDURAL ORDER NO. 1: PLACE, LANGUAGE AND CALENDAR

27. On 3 March 2015 the first procedural conference was held at which the procedural aspects of the arbitration and the procedural timetable were discussed.

28. On 12 March 2015 the Sole Arbitrator circulated a draft Procedural Order No. 1 to the Parties and invited them to present their comments by 20 March 2015[18].

29. On 20 March 2015 the Parties commented on the draft Procedural Order No. 1, having reached an agreement that the place of arbitration be The Hague, The Netherlands and the language of the proceedings English.

30. On 31 March 2015 the Sole Arbitrator issued Procedural Order No. 1.

## II.6. APPLICABLE LAW

31. The Contract does not expressly provide for the governing law. Articles 1.2 and 1.1 of the General Conditions state as follows:

> "1.2 Law Governing the Contract
>
> This Contract, its meaning and interpretation, and the relation between the Parties shall be governed by the Applicable Law".

> "1.1 Definitions
>
> [...]
>
> (a) "Applicable Law" means the laws and any other instruments having the force of law in the Government's country (or in such other country as may be

---

[17] Communication A 1.
[18] Communication A 3.

PCA Case No. 2014-33
Award

specified in the Special Conditions of Contract (SC)), as they may be issued
an in force from time to time".

32.   It is common ground between the Parties that the Special Conditions of Contract
did not specify the law of any "other country"[19].

## 1.   THE PARTIES' POSITIONS

33.   Initially, the Claimant argued that, in the absence of choice by the Parties, the
applicable law to the Contract was the law of the District of Columbia in the United
States. It also excluded the application of the laws of Cabo Verde[20].

34.   In its letter dated 2 February 2015 the Respondent incidentally pleaded that the
applicable law is that of Cabo Verde[21]. On 11 February 2015 the Respondent
provided further comments and insisted that the governing law should be the law
of Cabo Verde[22].

35.   In communication A 1, dated 13 February 2015, the Sole Arbitrator invited the
Parties to develop their arguments regarding the governing law of the Contract. On
25 February 2015 both Parties submitted their views on governing law.

–      The Claimant argued for the "closest connection or the most significant
relationship doctrine" and concluded, once again, that the applicable law
should be the law of the District of Columbia[23].

–      The Respondent averred that, by not agreeing on any other law, the parties
were accepting, pursuant to Article 1.1, that "the laws […] in the
Government's country" (namely, Cabo Verde) be applied[24]. Alternatively, the
object of the Contract was the privatisation and restructuring of a state-owned
company in Cabo Verde – a clear sign that the applicable law should be that
of Cabo Verde[25]. Finally, the Respondent highlighted that the law with the
closest and most real connection with the Contract was Cabo Verde's law,
since this was the place of performance[26].

## 2.   THE SOLE ARBITRATOR'S DECISION

36.   The Sole Arbitrator agrees with the Respondent: Articles 1.2 and 1.1 of the
Contract, read together, provide that, if the Parties do not specifically agree on the
legislation of any other country, the applicable law shall be that of the Government
signing the Contract – in this case, Cabo Verde.

---

[19] Claimant's letter, dated 25 February 2015; Respondent's letter, dated 11 February 2015.
[20] Claimant's letter, dated 30 January 2015.
[21] Respondent's letter, dated 2 February 2015: "[Portugal], where local courts would be familiar with
applicable law, given similarities with the law applicable to the merits […]".
[22] Respondent's letter, dated 11 February 2015.
[23] Claimant's letter, dated 25 February 2015.
[24] Respondent's letter, dated 25 February 2015, para. 2-10.
[25] Respondent's letter, dated 25 February 2015, para. 11-16.
[26] Respondent's letter, dated 25 February 2015, para. 20-23.

—

## II.7.  THE PARTIES' SUBMISSIONS AND CLOSING OF THE PROCEEDINGS

37.   On 14 April 2015, as provided for in Procedural Order No. 1, the Claimant submitted its Statement of Claim ["**C SC**"]. On 26 May 2015 the Respondent presented the Statement of Defence ["**R SD**"].

38.   On 16 June 2015, as provided for in Procedural Order No. 1, the Claimant presented the Statement of Reply ["**C SR**"]. Finally, on 7 July 2015, the Respondent submitted its Statement of Rejoinder ["**R SR**"].

39.   On 23 July 2015 the Sole Arbitrator issued communication A 5, noting that the Parties had agreed that an evidentiary hearing was not necessary, and thereby closing the proceedings.

40.   On 21 September 2015 the Sole Arbitrator temporarily reopened the proceedings, so that the Parties could submit their Statements on Costs[27].

41.   On 26 and 28 September 2015 the Respondent and the Claimant, respectively, submitted their Statements on Costs.

## II.8.  THE SUBMISSION OF NEW DOCUMENTS WITH THE C SR

42.   With its C SR the Claimant filed 16 documentary exhibits and the witness statement of Mr. Roger Jantio – the Claimant's CEO, who had signed the C SC on behalf of the Claimant.

43.   The procedural rules regarding the submission of evidence set out in Procedural Order No. 1 were as follows:

> "4.2 The Statement of Claim shall:
>
> 4.2.1 include as attachments all documents in possession, custody or control of the Claimant, on which it wishes to rely;
>
> 4.2.2 identify the fact witnesses and expert witnesses the Claimant wishes to present, and present their statements and/or reports".
>
> "4.7 The scope of this Statement of Reply shall be limited to replying to the argumentation set forth by the Respondent in its Statement of Defence, and to completing the argumentation set forth in the Statement of Claim with evidence which could not be made in or produced with the Statement of Claim".

---

[27] Communication A 6.

PCA Case No. 2014-33
Award

1. **THE RESPONDENT'S MOTION**

44. The Respondent averred that the Claimant had incorporated the evidence referred to above into the file in breach of the procedural rules contained in para. 4.7 of Procedural Order No. 1[28]. This provision required all evidence to be submitted with the C SC and limited the evidence annexed to the C SR to replying to the R SD[29]. Yet the evidence annexed to the C SR referred to facts already claimed in the C SC and should therefore have been produced with the C SC[30].

45. According to the Respondent, the Claimant's behaviour amounts to misconduct and should be sanctioned with the most appropriate remedy, taking into consideration the IBA Guidelines on Party Representation [the **"IBA Guidelines"**][31], which in Guidelines Nos. 26 and 27 list the following remedies[32]:

   – Admonishing the Party Representative;

   – Drawing appropriate inferences in assessing the evidence relied upon, or the legal arguments advanced by the Party Representative;

   – Considering the Party Representative's misconduct in apportioning the costs of the arbitration; and/or

   – Taking any other appropriate measure in order to preserve the fairness and integrity of the proceedings.

46. As with regards to the witness statement, the Respondent added that Mr. Roger Jantio, who had signed the C SC on behalf of the Claimant, later produced a witness statement, attached to the C SR. This late production should lead to the inadmissibility of the witness statement. Alternatively, if admitted, the witness statement should be considered subjective and biased[33].

2. **THE SOLE ARBITRATOR'S DECISION**

47. The Sole Arbitrator does not agree with the Respondent.

48. The R SD was a comprehensive submission, which raised a significant number of factual and legal arguments. In such circumstances due process requires that the Claimant be authorised to rebut these allegations and to marshal new evidence in its C SR. The Sole Arbitrator does not find that the Claimant's behaviour in this arbitration amounts to misconduct.

49. In any case, the Sole Arbitrator notes that the IBA Guidelines are only applicable "where and to the extent that the Parties have so agreed, or the Arbitral Tribunal,

---

[28] R SR, paras. 2.2 and 2.3.
[29] R SR, para. 2.2.
[30] R SR, para. 2.3.
[31] R SR, para. 2.6.
[32] R SR, para. 2.5.
[33] R SR, para. 2.4.

PCA Case No. 2014-33
Award

after consultation with the Parties, wishes to rely upon them"[34]. In this case, whilst the Parties agreed that the IBA Rules on the Taking in Evidence be applied[35], they did not settle on the application of the IBA Guidelines. The IBA Guidelines are, thus, not applicable.

50.  As with regards to Mr. Jantio's witness statement, the Sole Arbitrator does not share the Respondent's view that a late production should render the evidence inadmissible – inadmissibility being the harshest possible penalty; especially taking into consideration that the Respondent had ample opportunity in its R SR to respond to the evidence submitted by the Claimant, and to produce counter-evidence. The Respondent has further argued that the witness statement is subjective and biased; the Sole Arbitrator will take these arguments into consideration when determining the evidentiary weight attributable to the witness statement, as provided for in Article 9.1 of the IBA Rules on the Taking of Evidence.

51.  In conclusion, the Respondent's motion to strike certain evidence from the record and/or to apply the remedies foreseen in the IBA Guidelines is dismissed.

---

[34] Guideline 1.
[35] Procedural Order No. 1, para. 11.1.

# III.  FACTS

## III.1. BACKGROUND TO THE CONTRACT

### TACV

52.   TACV was established in 1958 and became a government-owned company in 1983. TACV is a Cabo Verdean passenger and cargo airline and operates inter-island services and international flights[36].

53.   In the early 2000's, despite some new business opportunities, TACV was facing severe difficulties that rendered its operations unprofitable. Indeed, in 2005 alone, it experienced losses of USD 1 million[37]. Cabo Verde saw the restructuring and privatization of TACV as a means to ensure its recovery.

### The privatisation program

54.   During the 1990's and 2000's, in an effort to develop the economy, the Government of Cabo Verde undertook a series of economic reforms, which privileged the development of the private sector and aimed at reducing the weight of the public sector[38]. These reforms were co-financed by the Government of Cabo Verde and the World Bank, through the International Development Agency ["IDA"][39]. To implement the privatisation and regulatory capacity-building program, a special unit was created – the Growth and Competiveness Project's Coordination Unit ["PCU"][40] – under the supervision of the Ministry of Finance, Planning and Regional Development.

55.   It was in this context that Cabo Verde planned the privatisation of TACV[41]. A two-step approach was chosen: the **First Phase** was the taking over of management of TACV in preparation for its privatisation and the **Second Phase** was the carrying out of the privatisation[42].

### Selection of Sterling

56.   On 7 May 2004 the World Bank and the PCU published an online "Request for Expressions of Interest". Consultants potentially interested in leading the management and privatisation of TACV – the First Phase – were invited to manifest their interest and present their qualifications by 21 May 2004[43].

---

[36] Doc C 1, Appendix A, Introduction.
[37] Doc C 1, Appendix A, Introduction.
[38] Doc C 1, Appendix A, Introduction; R SD, para. 3.1.
[39] Doc C 1, Appendix A, Introduction; R SD, para. 3.1.
[40] Doc C 1, Appendix A, Introduction; R SD, para. 3.1.
[41] Doc C 1, Appendix A, Introduction; R SD, para. 3.1-3.2; R WS 1, Section II, para. 1.
[42] C SR, para. 76.
[43] Doc R 1, p. 2.

57. By August 2004 the PCU had short-listed 10 potential consultants, including Sterling[44], and had sent out Requests for Proposals to each of the interested consultants, inviting them to submit technical and financial proposals to the management of TACV, describing the bidding process and outlining the management mandate[45].

58. The Claimant presented its technical and financial proposals and Cabo Verde considered selecting it as a consultant. However, the World Bank initially expressed concern regarding the person that Sterling proposed for the office of Chief Executive Officer (CEO) of TACV[46] – Mr. Gilles Filiatreault. In July 2005 the World Bank finally withdrew its objection to the choice of Sterling as a consultant[47]. Rather, it recommended that the contract to be entered between the Government of Cabo Verde and Sterling be "performance-based", in order to "[…] reduce the risk of wasting resources in case the consultant fails to fulfil key parts of the Scope of Work, particularly those related to privatizing the airline"[48].

   <u>Negotiation of the performance indicators</u>

59. The World Bank suggested that 50% of the payment of the future contract be linked to the Claimant's performance measured against specific indicators to be agreed upon[49]. In order to define these performance indicators, the Government of Cabo Verde hired Mr. Andy Ricover[50], who was entrusted with the definition of the key operational and financial indicators against which the performance of TACV's new management team would be assessed and to which its payment would be tied[51].

60. On 5 June 2006 Mr. Ricover submitted a draft report, proposing "non-measurable" and "measurable" performance indicators[52].

61. Amongst the "non-measurable" performance indicators, which, if not fully accomplished, would render the contract unsustainable, were:

   –   Safety requirements and
   –   Contract Deliverables (i.e. reports to be delivered by the consultant)[53].

62. As for the "measurable" performance indicators, the new management team was expected to:

   –   Implement modern revenue management techniques,
   –   Gain market share, and

---

[44] Doc C 2, p. 3-4; C SC, para. 13; R SD, para. 3.2.
[45] Doc C 2, p. 6-16.
[46] Doc R 2.
[47] Doc R 3, p. 2-3.
[48] Doc R 3, p. 3.
[49] Doc R 3, p. 3.
[50] Doc R 4.
[51] Doc R 4, Annex A: "Terms of Reference and Scope of Services".
[52] Doc R 5, p. 5-12.
[53] Doc R 5, p. 5-7.

     –    Augment the number of passengers per flight.

63.    On 15 June 2006 Mr. Ricover sent his draft report to the Claimant. The Claimant presented comments on the report on 19 June 2006 noting that the report only included the choice of indicators and not the actual targets that needed to be reached, which remained subject to a more thorough review and negotiation[54]. A period of negotiations ensued[55].

64.    There is no record of any further correspondence regarding the performance indicators.

### III.2. THE CONTRACT

#### Effective Date and Expiration Date

65.    The Contract was finally entered into between the Parties on 30 October 2006[56]. Although the commencement of services was contractually postponed until the 31 December 2006[57], both Parties agree[58] that the Contract entered into force on 1 December 2006.

66.    Article 2.3 established the term of 12 months for the expiration of the Contract, starting from the effective date, i.e. 30 October 2006[59]. There is, however common ground between the Parties that the expiration date was 30 November 2007[60].

#### Price

67.    The Contract's total price was settled at USD 950,490.62 [**"Contract Price"**], which was to be paid in six instalments following a precise schedule[61], as per Article 6.4 of the Contract:

    –    10% of the Contract Price was to be paid on the commencement date;

    –    15% of the Contract Price was to be paid upon submission and approval of the Assessment of TACV's current operational situation;

---

[54] Doc R 6.
[55] C SC, para. 15; R SD, para 3.9.
[56] Doc C 1; C SC, para. 16; R SD, para. 3.10.
[57] Doc C 1, Art. 2.2 of the Special Conditions. Both Parties argued in their submissions that the contract entered into force on 1 December 2006.
[58] C SC 26 and R SD 3.10.
[59] Doc C 1, Art. 2.3 of the Special Conditions, cross referenced in Art. 2.3 of the General Conditions.
[60] C SC para. 40 and R SD para. 3.14. Although Claimant begins saying that the last day of validity of the Contract was 1 December 2007 it states that the expiry date was 30 November 2007. The Sole Arbitrator considers that the Parties agree that the 30 November 2007 is the expiry date.
[61] Doc C 1, Art. 6.2(a) and 6.4 of the Special Conditions.

PCA Case No. 2014-33
Award

-   20% of the Contract Price was to be paid upon submission and approval of the Market Research and Strategic Development Plan;

-   20% of the Contract Price was to be paid upon submission and approval of the Comprehensive Five-Year Business Plan;

-   15% was to be paid upon submission and approval of the List of Potential International Partners and Networks for TACV;

-   20% was subject to a positive evaluation of the management mandate, based on the non-measurable and measurable performance indicators set forth in the Appendixes[62].

68.   The dispute between the Parties concerns the non-payment of this last 20%.

69.   Article 6.4 of the Special Conditions included a note which stated[63]:

> **"Note**: *The Client shall respond to all deliverables[*[64]*] submitted by the Consultant within 10 business days of each submission. If the Client's response is not forthcoming in that period, said deliverables shall be deemed approved. In the case the deliverables submitted by the Consultant are not approved by the Client, the latter shall detail the specific reasons for any objection and indicate a reasonable timeframe for these objections to be addressed in a satisfactory manner by the Consultant. The spirit of this clarification is to avoid situations where the Client may provide general and subjective feedback to the Consultant with observations that might not be easily corrected in light of the resources available for this assignment."*

70.   Article 6.5 of the Special Conditions specifies that each interim payment is to be made within 20 days of the receipt of the invoice by the Respondent, and the final payment within 30 days.

Scope of work

71.   As to the work to be performed by the Claimant, Appendix A of the Contract provides that the Claimant's main objectives are to[65]:

-   Implement TACV's operational and financial restructuring, leading day-to day operations and implementing the necessary restructuring steps;

-   Develop a sound recovery and privatisation strategy for the airline, commencing with an assessment of TACV's situation and evolution, taking into consideration studies made between 2000 and 2002 and providing a strategic development plan for the privatisation, after a market research, and preparing a comprehensive five-year business plan;

---

[62] Doc C 1, Art. 6.4 of the Special Conditions and appendix B of the Contract.
[63] Doc C 1, Art. 6.4 of the Special Conditions. Emphasis in the original.
[64] The "Deliverables" are the reports that should be presented by the Claimant, as per Appendix B of the Contract.
[65] Doc C 1, Appendix A, p. 20 of the Contract.

–   Identify international partners and networks for TACV;

–   Initiate integration and privatisation negotiations, after PCU has allowed concrete negotiations between Sterling and a potential partner to take place.

Performance indicators

72.   Appendix I provided that the performance of the management mandate would be measured against a set of indicators, namely:

–   <u>Non-measurable performance indicators</u>: this category included parameters considered conditional variables. Such parameters had to be accomplished in full; otherwise, the Contract would not be sustained. The indicators were:

·   Safety requirements: under the new management, TACV was to maintain a valid Air Operator Certificate ["**AOC**"];

·   Contract deliverables: the Claimant was required, under the Contract, to provide specific reports, as set forth in Appendices A and B;

·   Assessment of TACV's current operational situation;

·   Market research and strategic development plan;

·   Comprehensive five-year business plan;

·   List of potential international partners and networks for TACV.

–   <u>Measurable performance indicators</u>: compliance with these indicators was graded; they could be achieved partially without necessarily resulting in a termination of the Contract. Such indicators were:

·   Market share gain on selected routes: under the new management, TACV was to increase its business volume;

·   EBITDA/Sales: profitability was to be measured by EBITDA as a function of sales;

·   Restructuring of labour costs: the new management was expected to rationalise the workforce and restructure the labour costs.

73.   The measurable performance indicators, as noted in Appendix I, should be regarded as a combined set of variables. This combination would measure the efficient performance of the company.

74.   Moreover, Appendix I specifically stated:

"Specific achievement targets for each of the indicators in this section will be agreed upon by the contracting parties, in the two weeks after submissions and approval of the assessment of TACV's current operational situation".

75. Nearly a year after the signing of the Contract, on 23 July 2007, the Claimant wrote to the Respondent regarding the performance indicators, setting forth various proposals to modify each indicator. The communication ended stating that if the Respondent agreed to such proposals, the Claimant suggested that an addendum to the contract be drafted.[66]. According to the letter, the Claimant had previously submitted comments on each of the indicators and the Respondent had replied asking it to "come up with proposals to replace them".

76. However, there is no further evidence proving either that the indicators included in the Contract were replaced or modified or that the proposals laid down in the letter of 23 July 2007 were ever accepted by the Respondent.

### III.3. THE PERFORMANCE OF THE CONTRACT

77. On 1 December 2006 the Contract came into force[67]. The Claimant appointed Mr. Gilles Filiatreault as CEO of TACV[68] and began to provide the agreed services[69].

78. On 3 November 2006 the Claimant issued Invoice No. RBJ/pd/346 for the first 10% of the Contract Price (to be paid on the commencement date), which the Respondent paid in December 2006[70] [the "**First Payment**"].

79. On 28 February 2007 the Claimant submitted the First Quarterly Management Report. The Claimant has explained that, although this was not formally required under the Contract, the Claimant found it an effective way of monitoring Contract implementation[71].

80. On 3 March 2007 the Claimant submitted the report on the Assessment of TACV's Operational Situation along with Invoice No. RBJ/pd/353[72]. The Respondent presented no objection and made the payment of 15% of the Contract Price [the "**Second Payment**"][73].

81. On 8 May 2007 the Claimant submitted the Market Research and Strategic Development Plan and issued Invoice No. RBJ/pd/357[74]. Again, without any

---

[66] Doc R 7.
[67] C SC, para. 26; R SD, para. 3.10.
[68] Doc C 3; R WS 1, Section III, para. 1; C SC, para. 26; R SD, para 3.1: "The facts described in paragraphs 5 to 28 of the SOC [Statement of Claim] are generally correct."
[69] C SC, para. 28.
[70] Doc C 4; C SC, para. 28; R SD, para 3.1.
[71] C SC, para. 30.
[72] Doc C 6. In C SC, the Claimant says to have submitted the report on 3 March 2007 (para. 31), which is uncontested by the Respondent, although Invoice No. RBJ/pd/353 is dated from 1 March 2007.
[73] C SC, para. 31; R WS 1, Section III, para. 2.
[74] Doc C 7; C SC, para. 32.

objection, the Respondent made the payment of 20% of the Contract Price [the **"Third Payment"**][75].

82.    On 6 June 2007 the Claimant presented the Comprehensive five-year Business Plan[76] and issued Invoice No. RBJ/pd/363 on 20 June 2007[77]. The Respondent made no comments and disbursed 20% of the Contract Price [the **"Fourth Payment"**][78].

83.    Finally, on 30 November 2007, the expiration date, the Claimant submitted the List of Potential International Partners and Networks for TACV and Invoice No. RBJ/pd/370[79]. The Respondent, without raising any issues, made the payment of 15% of the Contract Price [the **"Fifth Payment"**][80].

84.    On that same day the Claimant issued Invoice No. RBJ/pd/372, for the sum of USD 190,098.12, with the following description "Twenty (20) percent of the lump-sum amount shall be subject to a positive evaluation of the management mandate, based on the non-measurable and measurable performance indicators set henceforth" [the **"Sixth Invoice"**][81]. The Sixth Invoice remains unpaid by the Respondent[82].

### III.4. ALLEGED EXTENSIONS OF THE CONTRACT

85.    Around October 2007 the Respondent started to analyse the possibility of pursuing the Second Phase of the privatization process and hiring the Claimant as consultant[83]. The PCU started discussions with the World Bank in order to secure additional funding for the next stage of privatisation[84].

86.    However, by 30 November 2007, the Parties had still not reached an agreement regarding Sterling's role as an advisor for the Second Phase of TACV's privatization, and the funding from the World Bank was not yet ensured[85].

87.    Upon the expiration date of the Contract, and in view of the fact that the Parties were still discussing next steps in the privatisation, the Parties signed an amendment to the Contract extending its validity for a period of two months, until 30 January 2008 ["**First Amendment**"], to prevent a void in the management of TACV[86].

---

[75] C SC, para. 32; R WS 1, Section III, para. 2.
[76] C SC, para. 33.
[77] Doc C 8.
[78] C SC, para. 33; R WS 1, Section III, para. 2.
[79] Doc C 11; C SC, para. 36.
[80] C SC, para. 36; R WS 1, Section III, para. 2.
[81] Doc C 13.
[82] C SC, para. 37; R SD, para. 4.46.
[83] R WS 1, Section III, para. 7.
[84] Doc C 16; R WS 1, Section III, para. 7 and 8; C SC, para. 41.
[85] C SC, para. 40; R SD, para. 3.19.
[86] Doc C 14; C SC, para. 40; R SD, para. 3.19.

PCA Case No. 2014-33
Award

88. While the negotiations between the Parties and between the Respondent and the IDA continued, the First Amendment expired in late January 2008. This led to the signature of a new amendment extending the validity of the Contract for another three-month period, until 30 April 2008 ["**Second Amendment**"][87].

89. In a letter dated 17 December 2007 the World Bank announced that the IDA was willing to reallocate funds within the Additional Financing Credit to fund "[…] the extension of the CEO's [of TACV] current contract for a period of one year […]" and to finance "[…] the fixed cost of a transaction advisor […] who would work independently from the current management team […]"[88].

90. This same letter noted that the World Bank expected to receive a copy of the Claimant's final reports and copies of its other deliverables[89].

91. On 7 March 2008 the World Bank addressed a letter to the Minister of State, Infrastructure, Transport and Sea of Cabo Verde. Although the World Bank was not satisfied with the Claimant's performance, it was ready to support PCU's decision to extend the Contract once it had received the documents requested in its letter of 17 December 2007, as well as the Respondent's evaluation of the Claimant's performance[90].

92. When the term of the Second Amendment expired, the Parties did not extend the Contract.

### III.5. POST-CONTRACTUAL EVENTS

Final services

93. The Second Amendment of the Contract provided for an extension of Sterling's services of three months, from January until April 2008. From April 2008 onwards there is no record that Sterling rendered services to the Government of Cabo Verde. However, the Parties agree that TACV's CEO continued to perform his duties through mid-June 2008[91]. On 13 June 2008, the Respondent asked TACV's CEO to resign from his functions[92].

94. On 10 September 2008 the Claimant issued Invoice No. RBJ/pd/383 [the "**Final Invoice**"], for the amount of EUR 202,068.44 regarding the management of TACV from 1 December 2007 to 18 June 2008[93]. This sum was divided as follows:

---

[87] Doc C 15; C SC, para. 40-41; R SD, para. 3.19.
[88] Doc R 8.
[89] Doc R 8.
[90] Doc C 16.
[91] C SC, para. 44; R SD, para. 3.25 and 3.27.
[92] C SC, para. 45; R SD, para. 3.26.
[93] Doc C 19.

PCA Case No. 2014-33
Award

    –    EUR 168,877.73 for the fees of the CEO, charged at the rate of USD 1,400 per day[94];

    –    EUR 33,190.71 for the management support rendered by a team leader for 35 days prorated at the rate of USD 2,046 per day[95].

95.    Although it is uncontroversial that on 18 November 2008 the Claimant submitted a final management report to the Respondent [the "**Final Management Report**"][96], this report has not been filed by either party; the closest document produced is the draft Management Report dated August 2008 [the "**Draft Management Report**"].

96.    The Draft Management Report included an analysis of each of the performance indicators, measurable and non-measurable, and a description of TACV's progress under Sterling's management.

97.    On 8 January 2009 the PCU sent a letter to the Claimant acknowledging that:

    –    The final payment of the Contract Price had not been made, because the end-of-mandate management report submitted by the Claimant was deemed incomplete and was not accepted.

    –    Sterling was owed payment of management fees for the period from 1 December 2007 to 18 June 2008, pertaining to the extension of the Contract.

    –    The extension of the Contract was not contemplated in the original funding obtained by the Government and so it would depend on a positive evaluation of the original mandate granted to Sterling[97].

98.    On 29 January 2009 the Claimant wrote to Cabo Verde's Minister of State, Infrastructures and Transports, claiming the amounts due under the unpaid invoices and requesting the Minister's support in resolving the situation between Sterling and the PCU[98].

99.    On 6 April 2009 the Claimant once again wrote to the PCU, informing it that given the lack of payment, Sterling had decided to pursue a legal route to resolve the dispute[99].

100.    On 27 April 2009 the Respondent paid EUR 168,877.73 corresponding to the fees of TACV's CEO[100]. The remaining EUR 33,190.71 were not paid since, in the

---

[94] Doc C 19: The invoice notes that the amount is "[...] payable in Euro at a rate of € 0.0820 per USD (applicable market rate on Dec. 1, 2007) = US$ 203,000.00".
[95] Doc C 19: The amount in USD is USD 39,897.00.
[96] C SC, para. 50; C SR, para. 3; R SD, para. 3.22 and 3.38; R SR, para. 1.3; Doc C-12.
[97] Doc C 24, paras. 1 and 2.
[98] Doc C 25.
[99] Doc C 26.
[100] Doc C 20; C SC, para. 47; R SD, para. 3.29.

PCA Case No. 2014-33
Award

Respondent's opinion, no tangible services had been provided beyond those provided by the CEO[101].

Arbitration proceedings

101. In May 2009 the Claimant reached out to the Respondent to seek an amicable solution to their dispute[102]. The Respondent answered that it was working towards an amicable resolution of the Contract, and that it would send a proposal as soon as possible[103].

102. Given the lack of understanding between the Parties, the Claimant filed an arbitration against the Respondent, first with ADR Systems, then with the ICDR and finally with the PCA[104].

103. Mr. Gilles Filiatreault, TACV's former CEO, has also sued the Claimant for alleged lack of payment of his salary from December 2007 through June 2008 and for an additional one-month termination notice plus interest. There is proof of one arbitration filed against the Claimant in an amount of USD 107,943.19[105]. The Claimant seems to have lost the case[106]. There is however no evidence regarding the amounts awarded against it.

---

[101] R SD, para. 3.29.
[102] Doc C 27; Doc R 10.
[103] Doc R 10.
[104] PCA's letter, dated 12 January 2015.
[105] Doc C 22.
[106] C SC, para. 59; R SD, para. 3.33.

PCA Case No. 2014-33
Award

# IV.  RELIEF SOUGHT BY THE PARTIES

## IV.1. THE CLAIMANT'S REQUEST FOR RELIEF

104.  In its Statement of Reply, the Claimant requests that the Sole Arbitrator issue an award in its favour and against the Respondent[107]:

> "94. […]
>
> a) Declaring that Sterling is entitled to bring a claim to the portion of the invoices owed to the Claimant;
>
> b) Ordering the Respondent to pay to Sterling the total amount owing to it under the invoices RBJ/pd/372 and RBJ/pd/383, being USD 476,143.24 (including interest);
>
> c) Ordering the Respondent to pay the arbitration costs in the case brought by the former CEO against the Claimant, being USD 79,030.55 (including interest);
>
> d) Ordering total amount for loss of business opportunities, being 4.5 million dollars;
>
> e) Ordering the Respondent to pay interest at a simple annual rate of 10.1% until the arbitral award is fully paid;
>
> f) Ordering the Respondent to pay Claimant's collection cost of USD 210,000.00;
>
> g) Awarding the Claimant costs in this arbitration;
>
> h) Awarding any such other and further relief as the Tribunal deems appropriate".

## IV.2. THE RESPONDENT'S REQUEST FOR RELIEF

105.  In its Statement of Rejoinder, the Respondent requests that the Sole Arbitrator adjudge and declare that[108]:

> "8.2. […]
>
> (i) The Government of Cabo Verde did not breach clause 6.4 of the Management Contract;
>
> (ii) Claimant, in turn, did not fulfil its obligations under said Management Contract and, for this reason, Respondent is under no obligation to pay

---

[107] C SR, para. 94.
[108] R SR, para. 8.2.

PCA Case No. 2014-33
Award

Claimant the amount corresponding to the last twenty per cent of the lump-sum amount due under the Management Contract;

(iii) Respondent is under no obligation to pay for:

(a) The € 33,190,71 regarding Invoice RBJ/pd/383, given that they do not correspond to any services rendered by Claimant, under the Management Contract or any other;

(b) The purported arbitration costs incurred by Claimant in the proceedings brought forward against it by the former CEO of TACV;

(c) The alleged collection costs incurred by Claimant; and

(d) The amount claimed, first as moral damages, and now as loss of profit, allegedly suffered by Claimant;

(iv) Respondent is not liable for any interest whatsoever over any of the above mentioned amounts, let alone calculated at an interest rate of 10%;

(v) Pursuant to article 40 of the UNCITRAL Arbitration Rules, Claimant shall bear all costs of the arbitration, including Respondent's costs with legal assistance and representation".

## V.   ISSUES TO BE DETERMINED

106. In view of the Parties' requests for relief, the Sole Arbitrator must adjudicate the following issues:

   – Has the Respondent breached its obligations under the Contract by failing to pay the Sixth Invoice? (**Section VI, First Issue**)

   – Does the Respondent owe the Claimant the unpaid amounts under the Final Invoice? (**Section VI, Second Issue**)

   – Is the Respondent accountable for the arbitration proceedings that were brought by the TACV's CEO against Sterling? Should the Respondent bear the costs of that arbitration? (**Section VI, Third Issue**)

   – Has the Claimant suffered a loss of business opportunities? If so, should the Respondent be held accountable for this loss and compensate the Claimant? (**Section VI, Fourth Issue**)

   – Has the Claimant actually incurred any collection costs? If so, should the Respondent be held accountable for those costs and compensate the Claimant? (**Section VI, Fifth Issue**)

   – What is the interest rate, *dies a quo* and *dies ad quem,* applicable to amounts due by the Respondent under this Award? (**Section VII**)

   – Who should bear the costs of this arbitration and in what proportion? (**Section VIII**)

PCA Case No. 2014-33
Award

# VI.  DISCUSSION ON THE MERITS OF THE CLAIM

## VI.1. FIRST ISSUE – NON-PAYMENT OF THE SIXTH INVOICE

107.  The Claimant contends that it is entitled to bring a claim against the Respondent for the unpaid sum of USD 190,098.12, claimed in the Sixth Invoice (**1.**). The Respondent invokes the *exceptio non adimpleti contractus*: the Respondent acknowledges the non-payment, but argues that it was the Claimant who was already in breach of the Contract (**2.**). The Sole Arbitrator will agree with the Claimant: the Sixth Invoice was due and the Respondent has not made out its case that the Claimant was in breach (**3.**).

## 1.  THE CLAIMANT'S POSITION

108.  On 30 November 2007 the Sixth Invoice was issued for the sum of USD 190,098.12, the final 20% of the Contract Price. The Claimant accepts[109] that, pursuant to Article 6.4 of the Special Conditions, this payment was

> "subject to a positive evaluation of the management mandate, based on the non-measurable and measurable performance indicators set [forth in the Contract]".

109.  The Claimant argues that the Respondent is now claiming that such "positive evaluation of the management mandate" could only be carried out after the Claimant had submitted a final management report in time. The Claimant does not agree for two reasons[110]:

–    First, the Contract did not specify how such evaluation had to be carried out – there was thus, no contractual obligation to produce a final management report;

–    Second, the Respondent could have carried out its own evaluation without a final management report.

110.  Alternatively, the Claimant claims that it did produce its Final Management Report on 18 November 2008[111] as a way to assist in the evaluation of the management mandate[112]. The Claimant further submits that it did so in time because it had to wait until its mandate was over: the relevant information could only be gathered and analysed once the management services had ended[113]. The Claimant notes that

---

[109] C SC, para. 37.
[110] C SR, para. 16.
[111] C SC, para. 50; C SR, para. 3.
[112] C SR, para. 16, 17 and 28.
[113] C SR, para. 17.

the Contract's validity was extended twice, after the initial expiration date of 30 November 2007[114].

111. Furthermore, the Claimant alleges that it never received any feedback from the Respondent requesting further information on the Final Management Report[115]. Hence, the Final Management Report is deemed approved by the Respondent[116] because the Respondent did not expressly disapprove such Final Management Report within the 10-day time frame provided for in the Contract[117]:

> "*Note: The Client shall respond to all deliverables submitted by the Consultant within 10 business days of each submission. If the Client's response is not forthcoming in that period, said deliverables shall be deemed approved. In the case the deliverables submitted by the Consultant are not approved by the Client, the latter shall detail the specific reasons for any objection and indicate a reasonable timeframe for these objections to be addressed in a satisfactory manner by the Consultant. The spirit of this clarification is to avoid situations where the Client may provide general and subjective feedback to the Consultant with observations that might not be easily corrected in light of the resources available for this assignment*".

112. Once deemed approved, the payment of the remaining 20% of the Contract Price was due[118], pursuant to Article 6.5 of the Special Conditions, within 30 days of receipt of the invoice[119]. The Respondent never made the last payment, and was thus in breach of its contractual obligations[120].

## 2. THE RESPONDENT'S POSITION

113. According to the Respondent, the Claimant was not entitled to payment of the Sixth Invoice, because it did not perform the obligations that would trigger such payment[121]: the payment of the final 20% of the Contract Price was subject to a "positive evaluation of the management mandate based on the non-measurable and measurable performance indicators".

114. The Respondent submits that the Claimant did not produce the report on the management on time (**A.**), that the Respondent did not accept such report (**B.**), and that, in any event, the Claimant had not achieved the results which would trigger payment of the last instalment (**C.**).

---

[114] C SR, para. 12 and 1.1.
[115] C SR, para. 32.
[116] C SR, para. 29 and 33.
[117] Doc C 1, Special Conditions, Art. 6.4, Note *in fine*.
[118] C SC, para. 37, 64 and 65.
[119] C SR, para. 56.
[120] C SC, para. 50; C SR, para. 37.
[121] R SD, para. 2.3 and 4.2.

PCA Case No. 2014-33
Award

### A.   No timely report

115. The Claimant did not submit the Final Management Report on time[122], so the Respondent claims.

116. The Respondent submits that the Final Management Report should have been filed before the expiration of the term of the Contract, i.e. by 30 November 2007. The Respondent denies that any possible extensions agreed by the Parties exempted the Claimant from its obligation to submit the report, because such extensions were simply intended to avoid a vacuum in the management of TACV[123].

117. However, the Claimant only submitted a draft version of the Final Management Report nine months after the term of the Contract[124], and the final version was not submitted until 18 November 2008[125].

### B.   The report was not accepted

118. The Respondent notes that the Final Management Report was reviewed and was not accepted. This is evidenced by:

–   The Claimant's letter of 29 January 2009, in which the Claimant acknowledges that the Final Management Report was not accepted[126];

–   The Claimant's admission to have held conversations with the Head of the PCU, Mr. Rui Cardoso Santos, during which Mr. Santos stated that he would like to "see more quantifiable data in the report"[127];

–   The email of the Head of the PCU making comments on the Final Management Report[128].

119. In response to the Claimant's argument that the Respondent did not meet the 10-day time limit to respond to the Final Management Report, pursuant to the Note to Article 6.4 of the Special Conditions of the Contract, Cabo Verde argues that such time frame does not apply to the Final Management Report[129]. And, even if it did, it would be abusive to expect Cabo Verde to provide comments within 10 days, when it took the Claimant almost one year to present the Final Management Report[130].

---

[122] R SD, para. 3.14 and 3.22.
[123] R SD, para. 3.23 and 3.38.
[124] R SD, para. 3.38.
[125] R SD, para. 3.38.
[126] R SD, para. 3.40 and 3.41; Doc C 25.
[127] R SD, para. 3.42 and fn. 9; Doc C 25.
[128] R SD, para. 3.42. The Respondent did not produce this email.
[129] R SD, para. 3.43.
[130] R SD, para. 3.43, 4.28, 4.33 and 4.34.

### C.   The performance indicators were not met

120. According to the Respondent, the payment of the final 20% of the Contract Price was subject to an evaluation of the Claimant's performance, and not merely to the delivery of a Final Management Report[131].

121. And such evaluation could not possibly have resulted in a positive review because the Claimant failed to meet the expected targets. According to the Respondent, the Contract entailed an obligation to financially restructure TACV, which was a duty of result. This means that, in order for the Contract to be deemed duly performed, this result had to be achieved[132].

122. Finally, the Respondent draws the Sole Arbitrator's attention to the fact that the Sixth Invoice was issued on 30 November 2007, although there was no Final Management Report at the time[133].

### 3.   THE SOLE ARBITRATOR'S DECISION

123. Article 6.4 of the Special Conditions provides, in its last item, that[134]:

> "Twenty (20) percent of the lump-sum amount shall be **subject to a positive evaluation of the management mandate, based on the non-measurable and measurable performance indicators set henceforth**".

124. The Contract establishes a clear condition to the payment of the last share (20%) of the Contract Price: this payment is subject to a positive evaluation of the management mandate. It, thus, imposes an obligation on the Respondent to evaluate Sterling's performance.

125. The Respondent has argued that said provision imposes on the Claimant an obligation to file a Final Management Report, which the Claimant breached by sending the report late; whilst the Claimant argues that it was under no obligation to prepared a Final Management Report and that the Respondent could have carried out an evaluation of the Claimant's performance on its own, without any assistance from the Claimant. The first issue to be decided is, thus, whether there was a contractual obligation to prepare the Final Management Report (**A.**); the Sole Arbitrator will come to the conclusion that, originally, there was no such contractual obligation, but that the Parties subsequently agreed that such a report was necessary. He will then analyse whether the Final Management Report was filed late, as the Respondent suggests (**B.**); the Sole Arbitrator will decide that it was not, since no deadline had been agreed upon.

126. As regards the requirement of a "positive evaluation", the Claimant submits that the Respondent failed to expressly reject the Final Management Report within 10 days from its receipt and therefore the report is deemed to be approved by the Respondent; whilst the Respondent maintains that such a strict deadline is not

---

[131] R SD, para. 4.12.
[132] R SD, para. 3.44, 4.8 to 4.11; R SR, para. 6.6, 6.8, 6.15 and 6.16.
[133] R SR, para. 3.3.
[134] Doc C 1, p. 17, Art. 6.4 of the Special Conditions. Emphasis in the original.

PCA Case No. 2014-33
Award

applicable and that, in any event, it did not approve the report (**C.**). The Sole Arbitrator will partially agree with the Claimant, and determine that the Respondent must pay the last instalment of the Contract Price (**D.**).

127. Finally, the Sole Arbitrator will address an alternative argument that if an evaluation had been carried out, it would have rendered a negative result (**E.**).

## A.   The requirement of a Final Management Report

128. The Sole Arbitrator has carefully reviewed the Contract and concurs with the Claimant that there is no explicit contractual obligation to produce a Final Management Report[135]. This conclusion notwithstanding, both Parties have now accepted that a prerequisite to the Respondent's evaluation under Article 6.4 was that the Claimant produce some kind of report addressing the extent to which the performance indicators had been complied with[136]. The Parties thus accept that the Claimant was under an implied obligation to present a report.

129. There is no discussion that the report is the so called Final Management Report, which was produced on 18 November 2008[137]; the issue is rather, whether the report was filed late.

## B.   Was the Final Management Report submitted late?

130. The Claimant has made a two-fold argument:

   –    The Contract does not mention a Final Management Report, and thus, if submitted voluntarily, it is not subject to a deadline;

   –    And, even if it was subject to a deadline, this deadline would be set after the management was over, i.e. after 30 November 2007, because the Contract was extended twice since its original expiration date.

131. The Respondent denies that the Contract's extensions implied an extension of the deadline for the Claimant to fulfil its contractual obligations.

132. The Sole Arbitrator can dismiss the Claimant's first argument right away because he has already found that there was an implied obligation to submit the Final Management Report and there must have been an equally implied obligation to submit it by a certain time. The question is, thus, by which time? Both Parties agree that the deadline expired shortly after the Contract came to an end. The point of disagreement is, precisely, when did the Contract cease to be in force?

---

[135] C SR, para. 16; R SD, para. 4.31; Doc C 1, p. 24.
[136] C SC, para. 50; C SR, para. 8; R SR, para. 3.3.
[137] In the file there is only the Draft Final Management Report dated August 2008. The Parties do not challenge the veracity of such draft, thus the Sole Arbitrator has considered it for purposes of the evaluation of the management mandate.

Original expiration date and subsequent amendments

133. The Contract's original expiration date is somewhat unclear: Article 2.1 of the Special Conditions provides that the Contract will come into effect on 30 October 2006[138]; Article 2.2 states that the date of commencement of services is 31 December 2006[139]; and Article 2.3 establishes that "the period shall be 12 months", starting as of the effective date pursuant to Article 2.3 of the General Conditions. In accordance with this set of provisions, it appears that the Contract would have expired by the end of October 2007; the Parties, however, are in agreement that the Contract expired on 30 November 2007.

134. The Parties agreed to extend the Contract twice, through two amendments:

– The First Amendment is dated 30 November 2007[140]:

> "[…] Considering that the Parties are in negotiation to extend the Contract and determine the terms and conditions of this extension.
>
> Considering that it is necessary to avoid any management vacuum of the company while negotiations for the extension are still on going. […]
>
> […][T]he parties hereto agree […] 1. To extend the said Management Contract for a period of two months. This Agreement may further be extended upon approval by the Parties."

– The Second Amendment, signed on 30 January 2008, provides[141]:

> "[…] Considering the amendment to the Management Contract signed on November 30, 2007, which will expire on January 30, 2008.
>
> Considering that the Parties are still in negotiation to extend the Contract and determine the terms and conditions of this extension, and that it is necessary to avoid any management vacuum at the company while negotiations for the extensions are still ongoing. […]
>
> To extend the said Management contract for a period of three month, in addition to the two-month extension signed on November 30, 2007. This Agreement may further be extended upon approval by the Parties".

135. The First Amendment extended the Contract's validity until 30 January 2008 and the Second Amendment extended it once more until 30 April 2008.

---

[138] "The date on which this Contract shall come into effect is October 30th, 2006".
[139] "The date for the commencement of Services is December 31st, 2006".
[140] Doc C 14, First Amendment to the Contract.
[141] Doc C 15, Second Amendment to the Contract.

PCA Case No. 2014-33
Award

End of the management

136. The Respondent has tried to minimise the significance of the above extensions arguing that they were only intended to avoid a management vacuum and that the Claimant's obligation to submit the report was still subject to the original deadline.

137. The Sole Arbitrator finds this argument unconvincing: it is common ground that the Final Management Report could not be filed until Sterling had finalised its management mandate; and it is a fact that TACV's management continued to be in the hands of Sterling at least until TACV's CEO was dismissed on 13 June 2008[142]. The argument that the CEO's work could be separated from Sterling's management[143] is a *non sequitur*, because Sterling's management was partially carried out through the CEO, who was an employee of, and received his salary from, Sterling[144].

138. It is thus not correct to affirm that the Final Management Report should have been filed shortly after 30 November 2007. The report should have been issued shortly after Sterling ceased to perform contractual duties. And this is in fact what happened:

   – Sterling managed TACV at least until mid-June 2008;
   – By August 2008 Sterling produced the Draft Management Report;
   – On 18 November 2008 Sterling filed the definitive version of the Final Management Report.

139. The Sole Arbitrator sees no indication of tardiness – a conclusion confirmed by the fact that the Respondent never complained to the Claimant about the alleged delay.

140. In conclusion, the Sole Arbitrator decides that under Article 6.4 of the Special Conditions the Claimant was under an implied duty to provide a Final Management Report and that it did so on 18 November 2008 in a timely fashion.

141. The Sole Arbitrator will now move on to analyse whether the Respondent made (or should be deemed to have made) a positive evaluation.

C.   **Positive evaluation**

142. The Claimant maintains that the Respondent's evaluation of the Final Management Report is subject to the 10-day deadline provided for in the Note to Article 6.4 of the Special Conditions:

> "**Note**: *The Client shall respond to all deliverables submitted by the Consultant within 10 business days of each submission. If the Client's response is not forthcoming in that period, said deliverables shall be deemed approved. In the case the deliverables submitted by the Consultant are not approved by the Client, the latter shall detail the specific reasons for any objection and indicate a reasonable timeframe for these objections to be*

---

[142] R SR, para. 1.10.
[143] R SD, paras. 3.25 *et seq.*
[144] C SR, para. 5 and 42; R SD, para. 3.28 and 4.53; R SR, para. 1.6.

> *addressed in a satisfactory manner by the Consultant. The spirit of this clarification is to avoid situations where the Client may provide general and subjective feedback to the Consultant with observations that might not be easily corrected in light of the resources available for this assignment".*

143. The Respondent is of the opinion that such deadline is not applicable to the response to the Final Management Report and that, in any event the 10 days provided for in the Note are not reasonable. The Sole Arbitrator agrees.

<u>Deliverables</u>

144. The Note applies to the time frame for the Respondent to submit responses to "all deliverables submitted by the Consultant". The key issue is thus, whether the Final Management Report constitutes a "deliverable".

145. The Contract refers to "deliverables" in Appendixes A[145] and B[146]. And in both Appendixes it is clear that "deliverables" are reports comprising:

— Assessment of TACV's current operations situation, with focus on:

---

[145] **"List and Schedule of Deliverables and actions**
1. Immediate take-over of operational management (CEO)
2. Assessment of TACV's current operational situation, with focus on:
- Corporate structure & human resources management
- Finance & controlling
- Network management
- Revenue management
- Product & services
- Sales & distribution
- Flight & ground operations
3. Market research and strategic development plan.
4. Comprehensive five-year business plan.
5. List of potential international partners and networks for TACV, and request for expressions of interest.
Deliverable 2 shall be submitted in draft to the PCU no later than 3 months after the date of effectiveness of the management contract. Deliverables 3, 4 and 5 should be submitted 3-6 months after that or at any other time that might be deemed more appropriate and agreed upon between the PCU and management during the inception of the management mandate".
[146] **"The Consultant is expected to prepare and submit to the Client electronic versions and three (3) hard** copies of the following reports:
1. Assessment of TACV's current operational situation, with focus on:
a. Corporate structure & human resources management
b. Finance & controlling
c. Network management
d. Revenue management
e. Product & services
f. Sales & distribution
g. Flight & ground operations
2. Market research and strategic development plan.
3. Comprehensive five-year business plan.
4. List of potential international partners and networks for TACV.
Deliverable 1 shall be submitted in draft to the PCU no later than three (3) months after the date of effectiveness of the management contract. Deliverables 2, 3 and 4 should be submitted 6-9 months after the date of effectiveness or any earlier time that might be deemed more appropriate and agreed upon between the PCU and management during the inception of the management mandate".

  ·  Corporate structure & human resources management
  ·  Finance & controlling
  ·  Network management
  ·  Product & services
  ·  Sales & distribution
  ·  Flight & ground operations
 – Market research and strategic development plan
 – Comprehensive five-year business plan
 – List of potential international partners and networks for TACV.

146. The Final Management Report is not one of the four reports mentioned in the Appendixes and can therefore not be considered a "deliverable" pursuant to the Contract. It follows that the 10-day deadline for the Respondent to provide a response, foreseen in the Note to the Contract, does not apply to the Final Management Report.

<u>Time limit for evaluation</u>

147. If the Respondent's evaluation pursuant to Article 6.4 is not subject to the 10 days deadline, what is then the applicable time frame? The Sole Arbitrator cannot find an explicit answer in the Contract. Does this mean that the mandatory evaluation was subject to no deadline?

148. The answer must be in the negative. According to Cabo Verdean law, contracts are to be interpreted according to their usual sense and favouring that construction which renders balanced considerations[147], and any *lacunae* must be completed pursuant to the standards imposed by good faith[148]; additionally, Cabo Verdean law provides that whenever a party consents to a conditional obligation, such party has to act in good faith, so as to not jeopardise the counterparty's rights[149]. It is not reasonable to sustain that the Respondent's positive evaluation of the Claimant's management, upon which payment of the last instalment was conditioned, is exempted from any time limit. The Respondent could then, at its own discretion, postpone payment *sine die*, under the excuse that it still had not evaluated the management.

149. The Respondent's evaluation must, thus, be subject to a deadline. In the absence of a specific contractual provision, applying the Cabo Verdean principles of construction, the Sole Arbitrator decides that the deadline must be reasonable. The

---

[147] Article 236.1 of the Civil Code: "*A declaração negocial vale com o sentido que um declaratório normal, colocado na posição do real declaratório, possa deduzir do comportamento do declarante, salvo se este nao puder razoavelment contar com ele*". Article 237 of the Civil Code: "*Em caso de dúvida sobre o sentido da declaração, prevalece, nos negócios gratuitos, o menos gravoso para o disponente e, nos onerosos, o que conduzir ao maior equilíbrio das prestações*".
[148] Article 239 of the Civil Code: "*Na falta de disposição especial, a declaração negocial deve ser integrada de harmonia com a vontade que as partes teriam tido se houvessem previsto o ponto omisso, ou de acordo com os ditames da boa fé, quando outra seja a solução por eles imposta*".
[149] Article 272 of the Civil Code: "*Aquele que contrair uma obrigação ou alienar um direito sob condição suspensive, ou adquirir um direito sob condição resolutiva, deve agir, na pendência da condição, segundo os ditames da boa fé, por forma que nao comprometa a integridade do direito da outra parte*".

PCA Case No. 2014-33
Award

question which now arises is whether the Respondent did evaluate the Claimant's performance within a reasonable time.

Evidence of evaluation

150. It is common ground that the Respondent had to evaluate whether the Claimant had accomplished the performance indicators[150]. The Contract required the Claimant to fully comply with the non-measurable performance indicators (safety requirements and contract deliverables)[151] and to partially comply with the measurable performance indicators (market share gain on selected routes, increase in the business volume and sale of more seats in the main air routes)[152].

151. The Sole Arbitrator would have expected the Respondent to produce evidence that it had measured the Claimant's management against the indicated criteria. There is, however, no satisfactory evidence in the file that this happened. The Respondent simply avers that it submitted comments and objections to the Final Management Report – not that the Claimant's performance fell short of the agreed criteria.

152. The Respondent tries to find support for its position in certain statements made by the Claimant in a letter dated 29 January 2009[153]; and in its own letter of 8 January 2009, in which the Respondent notified that it considered that the management mandate had not been completed and that the final payment was therefore not due[154]. The Respondent has also produced the witness statement of Mr. Cardoso-Santos (the Head of the PCU) in support of these averments.

153. The Sole Arbitrator has reviewed the evidence contained in the file and concludes that the Respondent has failed to properly make out its case:

–   Mr. Cardoso-Santos has testified in writing that, when the Final Management Report was received, the PCU found that it was incomplete and did not allow for an evaluation of the management mandate and that Mr. Roger Jantio was informed several times accordingly[155], including in a detailed email listing the reasons behind PCU's decision to withhold the last instalment[156]; unfortunately Mr. Cardoso-Santos is unable to provide specific details of PCU's communications with Sterling and to retrieve the alleged email[157]. The Sole Arbitrator finds that Mr. Cardoso-Santos' witness statements lacks documentary support.

–   The Respondent's letter of 8 January 2009[158] simply states that the Final Management Report is "deemed incomplete and has not been accepted"; but

---

[150] C SR, para.16 and 28; R SD, para. 4.37 and 4.44; R SR, para. 1.9(iii).
[151] Doc C 1, Appendix I to the Contract, p. 26.
[152] Doc C 1, Appendix I to the Contract, p. 27.
[153] R SD, para. 3.41 and 3.42; R SR, para. 4.9.
[154] R SD, para. 3.57.
[155] R WS 1, Section III, para. 11.
[156] R WS 1, Section III, para. 12.
[157] R WS 1, Section III, para. 12.
[158] Doc C 24.

PCA Case No. 2014-33
Award

the mere assertion that a requirement has not been met does not discharge the Respondent of its *bona fides* duty to evaluate the Claimant's management and to inform the Claimant of the result of such evaluation.

— The Respondent also refers to the Claimant's letter of 29 January 2009[159] in which Sterling states that "a couple of weeks ago" Mr. Cardoso-Santos had expressed in conversation that he wished to see more quantifiable data in the report[160]. The full quotation of the letter is the following[161]:

> "Indeed, to this day, we have not received formal comments, other than the conversation I had with Mr. Rui Cardoso-Santos a couple of weeks ago and during which he expressed the desire to see more quantifiable data in the report. This clearly means that the corresponding invoice for this report is due as of November 28, 2008".

The full quote in fact proves the contrary of what the Respondent is averring. It rather shows that by January 2009 Cabo Verde had failed to make any formal evaluation of the report, and that all that had happened was an informal conversation between Messrs. Jantio and Cardoso-Santos in which additional data had been requested.

154. In view of the above, the Sole Arbitrator concludes that the Respondent has not adequately discharged its burden to prove that it carried out and submitted a negative evaluation of the Claimant's performance within a reasonable time. The consequences of this finding will be analysed in the following subsection.

### D.   Consequence: the Respondent must pay the final instalment

155. Pursuant to Article 6.4 of the Special Conditions, payment of the last instalment was subject to the Respondent carrying out a positive evaluation of the Claimant's management.

156. The Sole Arbitrator has determined that the Respondent failed to comply with this condition precedent. The consequences of the Respondent's breach are laid out in Article 275.2 of the Cabo Verdean Civil Code: to the extent that the condition was prejudiced, contrary to the rules imposed by good faith, by the party benefitting from such breach, the condition is deemed to be complied with[162].

157. Consequently, under Cabo Verdean law, the Respondent is deemed to have positively evaluated the Claimant's management. Hence, the condition precedent to the payment of the last instalment is complied with and the Respondent is required to pay the last 20% tranche of the Contract Price, due under the Sixth Invoice.

---

[159] Doc C 25.
[160] Doc C 25, p. 2.
[161] Doc C 25, p. 2.
[162] "*Se a verificação da condição for impedida, contra as regras da boa fé, por aquele a quem prejudica, tem-se por verificada; se for provocada, nos mesmos termos, por aquele a quem aproveita, considera-se com não verificada*".

158. Having so found, the Sole Arbitrator will address a final alternative argument raised by the Respondent.

### E.   Alternative argument: the evaluation would have been negative

159. The Respondent has averred that the Claimant's performance under the Contract could never have obtained a positive evaluation, because it failed to accomplish in full the non-measurable indicators and to partially accomplish the measureable ones[163].

160. The Sole Arbitrator is not persuaded: Article 6.4 requires the Respondent to carry out an evaluation of the Claimant's performance, which the Respondent failed to undertake and is now deemed to have undertaken with a positive result; whether or not the Claimant's performance was satisfactory is no longer relevant because by failing to carry out the evaluation the Respondent has forfeited its right to rely on an alleged inadequate performance.

161. In any event, the Sole Arbitrator is not persuaded that the Respondent has made out its case; the evidence in the file is not conclusive in proving that the Claimant failed to meet the performance indicators.

<u>Non-measurable performance indicators</u>

162. The Claimant's performance was to be analysed against two non-measurable performance indicators: safety requirements and contract deliverables[164].

   – The safety requirement would be deemed satisfied if TACV was able to maintain a valid AOC as a proof of total compliance with all the applicable safety regulations[165] and if Sterling pursued TACV's application to full IATA membership[166]. According to the Draft Management Report, TACV maintained its AOC[167]; and the Claimant explained that in order to acquire the full IATA membership, TACV needed to obtain the IATA Operational and Safety Audit (IOSA) certification – and Sterling engaged a specialist firm "Partners and Resources for Operational Safety" to carry out an audit to determine the level of fulfilment of the standards required for IOSA registration[168]. The Sole Arbitrator is of the opinion that the safety requirements were met.

   – As to the contract deliverables, the Claimant had to deliver the reports mentioned in Appendix B of the Contract; as the Parties both agree, the Claimant met this obligation[169].

---

[163] R SD, para. 4.35.
[164] Doc C 1, p. 26 and 27.
[165] Doc C 1, p. 27.
[166] Doc C 1, p. 27.
[167] Doc C 12, p. 5.
[168] Doc C 12, p. 6.
[169] C SC, para. 31-36; C SR, para. 17; R SD, para. 3.25; R SR, para. 1.10; R WS 1, Section III, para. 2-3.

_Measurable performance indicators_

163. The Claimant's performance would also need to be assessed in view of the partial accomplishment of the measurable performance indicators. These indicators can, in accordance with the Contract, be achieved partially, and so they "should be measured in relative units to the predefined goals"[170]; and the indicators are not to be regarded separately but as a combined set of variables – "it is the combination of them that will measure the efficient performance of the company"[171]:

   – Market share gain on three selected routes: pursuant to the Contract[172] the percentage of sold seats, against the competing airlines, in the routes Sal-Lisbon-Sal and Praia-Dakar-Praia should be measured (there is no indication that a third route was chosen). The Draft Management Report does not single out data with respect to these routes, but indicates that the passenger seats sold in the regional market (which includes the Praia-Dakar-Praia route)[173] and international market (which includes the Sal-Lisbon-Sal route) had increased comparing the first quarter of 2007 with the first quarter of 2008 by 94.35% and 4.33%, respectively[174]. There is no sufficient evidence to rule out that this indicator had not been met; in fact, there is circumstantial evidence that the number of passengers in the routes mentioned had increased.

   – EBITDA/Sales: the Draft Management Report notes that staffing constraints have prevented an overhaul in the accounting system, as a result of which the 2007 books were not ready in time[175]. Since the Parties have not produced the final version of the Report, the Sole Arbitrator cannot establish whether this indicator was not complied with.

   – Recommendation on labour costs restructuring: the Draft Management Report states that 164 positions were redundant of which 88 had already been laid off[176] and sets out the five objectives of the new labour structure[177]. The Sole Arbitrator is of the opinion that the Claimant met this indicator.

164. <u>In conclusion</u>, the Sole Arbitrator has determined that the Claimant fully complied with the non-measurable performance indicators as required by the Contract. As regards the non-measurable performance indicators, the Contract required a global partial fulfilment and the Claimant fully complied with one measurable indicator, there is circumstantial evidence that another measurable indicator was satisfied, and there is insufficient evidence to rule out that the remaining measurable indicator was fulfilled. The Sole Arbitrator concludes that the Respondent has not adequately made out its case that the Claimant failed to comply with the performance indicators.

---

[170] Doc C 1, Appendix I, p. 27.
[171] Doc C 1, Appendix I, p. 27.
[172] Doc C 1, Appendix I, p. 28.
[173] Doc C 12, p. 8: Services between Cabo Verde and Western Africa.
[174] Doc C 12, p. 9 and 10: (16,395-8,436)/8,436=+94.35%; (67,659-64,850)/64,850=+4.33%.
[175] Doc C 12, p. 2.
[176] Doc C 12, p. 12.
[177] Doc C 12, p. 12.

### VI.2. SECOND ISSUE – PAYMENT OF THE FINAL INVOICE

165. The second cause for discord between the Parties concerns the Final Invoice and the services provided from December 2007 to June 2008.

166. Although both Parties agree that the Respondent paid part of this invoice, the Claimant claims that the Respondent still owes EUR 33,190.71, for TACV's management expenses (**1.**). The Respondent argues that the Claimant failed to marshal any evidence that Sterling provided any services during that period and, therefore, it is not entitled to the payment of that outstanding sum (**2.**).

### 1.   THE CLAIMANT'S POSITION

167. The Claimant argues that it continued to provide services under the Contract until 13 June 2008, when TACV's CEO was dismissed[178]. Indeed, the Contract's validity was extended twice and the Claimant continued to manage the airline until June 2008, mainly through TACV's CEO, but not exclusively[179].

168. On 10 September 2008 Sterling issued the Final Invoice, which comprised the CEO's fees from 1 December 2007 to 13 June 2008, plus 35 days of management work by Sterling[180]. The Claimant avers that it only charged for 35 days of work when, in fact, its team, which assisted the CEO on an everyday basis[181], devoted 83 days of work to the project[182].

169. The Respondent partially paid this invoice by wire transfer, almost a year after the CEO's dismissal[183]. Despite the fact that the Respondent had acknowledged that it owed the management services provided by Sterling from December 2007 to 13 June 2008[184] it failed to pay the 35 days of management work actually devoted to this project[185].

### 2.   THE RESPONDENT'S POSITION

170. The Respondent argues that the Contract expired on 30 November 2007[186], when Sterling stopped providing services to TACV[187]. Therefore, the amount claimed under the Final Invoice has no contractual or legal basis[188].

---

[178] C SC, para. 44 and 45; C SR, para. 13.
[179] C SR, para. 18.
[180] C SC, para. 46.
[181] C SR, para. 19.
[182] C SC, para. 48.
[183] C SC, para. 47.
[184] C SC, para. 51; C SR, para. 38 and 39.
[185] C SC, para. 47 and 48.
[186] R SR, para. 1.10.
[187] R SD, para. 3.15.
[188] R SD, para. 2.4; R SR, para. 1.10.

171. According to the Respondent, the scope of the Contract's extensions was to ensure that TACV's CEO continued to run the company while the Parties negotiated the Second Phase of the project, thus avoiding a management vacuum[189].

172. The Respondent acknowledges that after the Contract's termination, some services were provided by TACV's CEO, who was the only person present in Cabo Verde[190]. However, these services did not include the EUR 33,190.71 invoiced as "project coordination", because at the time there was no longer any project to coordinate[191]. Indeed, the Claimant had already performed all the tasks provided for in the Contract, except for the submission of the Final Management Report[192]. The Final Management Report was an obligation that derived from the Contract and that should not give rise to a claim for extra payment[193].

173. The Respondent notes that it paid EUR 168,877.73, corresponding to TACV's CEO's management fees on 27 April 2009[194]. The remaining portion of the invoice was left unpaid because no tangible services had been provided beyond those of the CEO[195].

174. The Respondent concludes that the amount claimed under the Final Invoice is not due, since there was no agreement on the matter, the services in question were never requested, and there is no evidence that they were actually performed[196].

3.   **THE SOLE ARBITRATOR'S DECISION**

175. It must be noted that, as explained above, the Contract was extended twice and remained valid for five more months after 30 November 2007[197].

176. Although the Parties do not contest that TACV's CEO continued to work during that period of time, they disagree on the extent of the work performed by Sterling's team. The Respondent argues that there is no proof that anyone besides the CEO provided management services after 30 November 2007, while the Claimant affirms that it assisted the CEO on a nearly everyday basis.

177. The Sole Arbitrator concurs with the Respondent:

    –   First, the Claimant has failed to marshal any evidence of this additional consultancy work that it claims to have performed: there is no information regarding the activities of Sterling as a consultant between December 2007 and April 2008.

---

[189] R SD, para. 3.25; R SR, para. 1.10 and 4.3.
[190] R SD, para. 3.25.
[191] R SD, para. 2.4.
[192] R SD, para. 3.25; R SR, para. 1.10.
[193] R SR, para. 6.5.
[194] R SR, para. 4.4.
[195] R SD, para. 3.29 and 4.48; R SR, para. 4.10.
[196] R SD, para. 4.48; R SR, para. 6.5.
[197] Doc C 14, p. 1 and 2; Doc C 15, p. 1.

    &minus;   Second, the Claimant has not even explained how the daily fee of USD 2,046.00 per day mentioned in the invoice[198] was reached.

178. Given the indisputable lack of evidence regarding this claim, the **Claimant's request** for payment of the sum of EUR 33,190.71 included in the Final Invoice is hereby dismissed.

## VI.3. THIRD ISSUE &ndash;ARBITRATION COSTS IN THE CEO'S CASE

179. On 13 June 2008 the Respondent asked TACV's CEO to resign from his functions. Subsequently, the former CEO filed a claim against Sterling for unpaid sums during the period in which he managed the company.

180. The Claimant requests that the Respondent be ordered to pay the arbitration costs incurred in the case against the former CEO (**1**). The Respondent replies that the fact that the CEO brought an arbitration claim against Sterling is only attributable to the Claimant's own conduct and, therefore, Cabo Verde cannot be held responsible (**2**).

## 1. THE CLAIMANT'S POSITION

181. On 21 November 2008 TACV's CEO filed a claim against Sterling in the Superior Court of the District of Columbia, to recover payment of USD 70,987.70 corresponding to fees and expenses[199]. After that, TACV's CEO also commenced an arbitration against the Claimant for the payment of two months of unpaid fees. According to the Claimant, an award was issued in favour of the CEO[200].

182. The Claimant argues that it was unable to pay Mr. Filiatreault's fees as it experienced a lack of cash-flow due to the Respondent's non-payment of the invoices now being claimed[201].

183. Moreover, the Respondent unilaterally dismissed TACV's CEO, without any legal justification, going far beyond its powers and in breach of Cabo Verde's labour law[202]. In addition, since the beginning of the management mandate, the Respondent was fully aware of the CEO's credentials and never raised any material concerns[203].

---

[198] Doc C 19.
[199] C SC, para. 53.
[200] C SC, para. 59.
[201] C SC, para. 49.
[202] C SC, para. 45; C SR, para. 9(c), 20 and 21.
[203] C SR, para. 11.

PCA Case No. 2014-33
Award

184. The Claimant argues that the Respondent should pay Sterling's costs in the arbitration proceedings, since such procedure was a direct result of the Respondent's contractual breach and unlawful dismissal of the CEO[204].

185. The total cost incurred by the Claimant in the arbitration with the CEO amounts to USD 35,125[205]. The Claimant further requests the payment of USD 1,250 as an additional legal fee requested by the former CEO, plus interest. In total, the Claimant requests the payment of the amount of USD 79,030.55[206].

2.   **THE RESPONDENT'S POSITION**

186. The Claimant failed to pay Mr. Filiatreault what he was owed[207]: until the management mandate ended on 30 November 2007, his salary was USD 13,333/month and for the subsequent months until his resignation, he agreed with the Claimant a salary of USD 15,000/month. The Claimant however never paid him the salary raise; and also failed to disburse the June salary and the one-month notice to which he was entitled.

187. The Respondent notes that the Claimant's position with respect to this claim has changed from the Statement of Claim to the Statement of Reply[208]. Indeed, while the Claimant initially argued a lack of cash flow caused by the Respondent's failure to pay as the ultimate cause for the failure to pay its CEO (**A.**), it changed its argument to the unlawful dismissal of the CEO by the Respondent in its Statement of Reply (**B.**). The Respondent takes issue with both arguments and makes the general comment that there is no evidence that the Claimant suffered losses as a result of the CEO's lawsuit and that there is no causal link between any alleged losses and the Respondent's conduct[209].

A.   **Lack of cash flow**

188. The Claimant argues that it was not able to continue to pay the CEO because it experienced a lack of cash flow due to the Respondent's breach of the Contract. However, the Claimant fails to prove such lack of cash flow, and also fails to establish a connection between the Respondent's alleged non-compliance with its obligations and the Claimant's non-payment to the CEO.

189. In fact, the fees being claimed by the CEO are those allegedly owed for services rendered between January and June 2008 and by that time neither the Sixth Invoice nor the Final Invoice were due, as there was still no Final Report and the Final Invoice had not yet been issued[210].

---

[204] C SC, para. 59 and 67; C SR, para. 85.
[205] C SC, para. 59 and 67.
[206] C SR, para. 23, 85 and 94(c).
[207] R SD, para. 3.31, (a) through (f).
[208] R SR, para. 3.4.
[209] R SR, para. 4.7.
[210] R SD, para. 4.52.

### B. Unlawful dismissal

190. First of all, the Respondent submits that TACV's CEO never based his request for arbitration against the Claimant on the ground of unlawful dismissal; the Claimant's argument is thus irrelevant[211].

191. But even if it were relevant, the Respondent avers that by the time TACV's CEO was asked to step down from his post, there was no longer any contract between the Claimant and the Respondent[212]; moreover, there was never a contract between TACV's CEO and the Respondent. The CEO had an employment contract with the Claimant; therefore it was the Claimant who was responsible for the payment of the CEO's fees[213].

192. In any event, the Respondent could never be held liable for the Claimant's mismanagement[214]. The arbitration initiated by TACV's CEO against Sterling can only be attributed to the Claimant's conduct[215].

### 3. THE SOLE ARBITRATOR'S DECISION

193. The Sole Arbitrator concurs with the Respondent that there is no evidence of any cost incurred by the Claimant as a consequence of the arbitration filed by the former CEO. In fact, the only piece of evidence marshalled by the Claimant is the electronic form of the Request for Arbitration; specifically there is no proof of any amount having been awarded to Mr. Filiatreault, no proof that illustrates how the Claimant reached the claim sum of USD 79,030.55, and ultimately there is no proof that the Claimant actually incurred any expense related to the alleged claim filed by Mr. Filiatreault against the Claimant.

194. Additionally, even if adequate proof had been produced, the Sole Arbitrator is also not convinced of the causal link between the damage and the Respondent's alleged misconduct. The Sole Arbitrator concurs with the Respondent that:

  – The unpaid Sixth Invoice was issued before any monies were owed to Mr. Filiatreault; there is, thus, no causal link between the Respondent's unlawful conduct and Mr. Filiatreault's claim;

  – Mr. Filiatreault's unlawful dismissal cannot be attributed to the Respondent because the Respondent had no employment contract with him; it was the Claimant who employed Mr. Filiatreault.

195. In view of the above, the Sole Arbitrator dismisses this claim.

---

[211] R SR, para. 3.5(ii) and 4.6.
[212] R SD, para. 3.26.
[213] R SD, para. 3.28.
[214] R SD, para. 4.53.
[215] R SD, para. 2.5.

PCA Case No. 2014-33
Award

## VI.4. FOURTH ISSUE – THE CLAIMANT'S LOSS OF BUSINESS OPPORTUNITIES

196. The Claimant requests that the Respondent be ordered to pay USD 4.5 million as moral damages. It bases its request on a loss of reputation that allegedly resulted in the loss of business opportunities and blames the Respondent's conduct for such losses (**1.**). The Respondent objects to the Claimant's request by arguing that none of the requirements of contractual liability are met (**2.**).

### 1.   THE CLAIMANT'S POSITION

197. The Claimant argues that it suffered losses as a result of the Respondent's conduct[216], in particular a loss of reputation[217]. The suit brought by TACV's former CEO had a negative impact on the Claimant's public image, which can only be attributed to the Respondent's actions[218].

198. This loss of reputation severely affected Sterling's:

   –   Capacity to recruit new talent and to establish new partnerships[219].

   –   Business opportunities in the African market[220]; in particular, the Claimant submits that it lost the contract to deploy airport security at the Republic of Congo's international airports in Brazzaville, PointeNoire and Ollombe [the "**Congo Deal**"] because SITA, the Claimant's technical partner, stepped back once it learnt about the arbitration launched by TACV's CEO. The Congo Deal had been valued at USD 80 million and Sterling's share represented 20% or USD 16 million pre-minority discount, which the Claimant adjusts to USD 4.5 million by using a comparable offer made by Aurora Private Equity S.A. to acquire 20% of the Congo Deal for USD 4.5 million[221].

199. The Claimant argues that moral damages can be awarded to legal persons just as to natural persons[222], and bases its request for damages on the principle of full compensation established in Article 562 of Cabo Verde's Civil Code, which provides that[223]:

   "*Quem estiver obrigado a reparar um dano deve reconstituir a situação que existiria, se não se tivesse verificado o evento que obriga à reparação*".

200. The Claimant adds that there is a decision of the Portuguese Supreme Court dated 1976, which awarded compensation due to loss of chance.

---

[216] C SR, para. 86.
[217] C SC, para. 72 and 73.
[218] C SC, para. 73.
[219] C SC, para. 74 and 75.
[220] C SC, para. 75-77, C SR, para. 89.
[221] C SC paras. 75-78; C SR, para. 90.
[222] C SC, para. 72.
[223] C SC, para. 69; C SR, para. 86.

## 2.   THE RESPONDENT'S POSITION

201. The Respondent submits that the relevant provisions on damages under Cabo Verdean law are Article 798 of the Civil Code, which provides that the debtor who breached an obligation is liable for the damages caused to the creditor, and Article 799, which adds that it is the debtor who bears the burden of proving that the non-compliance with his obligations is not attributable to his actions or omissions.

202. According to the Respondent, the duty to compensate someone as a consequence of a contractual breach depends on the fulfilment of the following cumulative requirements[224]:

   — A contractual or otherwise unlawful breach, due to an action or an omission;
   — Fault on the debtor's part;
   — Damage; and
   — A causal link between the breach and the damage.

203. However, in this case:

   — The Respondent has denied being in breach[225];

   — There is no evidence of damages: under the Portuguese doctrine and jurisprudence, corporate entities do not endure and are not entitled to moral damages[226]; they can only claim patrimonial damages, resulting from a given offense to their good name or reputation, which they must show led to a tangible loss of profit[227]; but here the Claimant did not produce any evidence supporting the alleged damage, or any credible basis for its *quantum*[228].

   — The Claimant has failed to explain how the purported offense by the Respondent could have led to any damage and what could justify being awarded moral damage[229].

## 3.   THE SOLE ARBITRATOR'S DECISION

204. The Claimant requests to be awarded moral damages as a result of the Respondent's breach of its contractual obligations; namely, not having paid the invoices allegedly due. According to the Claimant, such conduct is illegal and has resulted in moral damages, consisting of injury to its credit and reputation.

205. On this issue, the Sole Arbitrator finds for the Respondent.

206. First, the Sole Arbitrator is persuaded that for a legal entity to be eligible for compensation for the loss of reputation, such loss must result in a material damage.

---

[224] R SD, para. 4.15 and 4.16.
[225] R SD, para. 4.23 and 4.50.
[226] R SD, para. 4.60-4.64.
[227] R SD, para. 4.64.
[228] R SD, para. 2.8.
[229] R SD, para. 4.67.

But in this case, the Claimant has not adequately discharged its burden of proof of the alleged damages in an amount of USD 4.5 million:

-   The Claimant has only adduced a Preliminary Investment Agreement[230] entered into between Airport Biometric Holding Limited and Aurora Equity Investors, S.A. in which Sterling would assume the position of technical assistant to a company to be later incorporated in Congo. There is no evidence that such agreement has actually materialised.

-   The Claimant has further failed to show the material damage that Mr. Kambala Achi's refusal to become Sterling's chief economist[231] caused Sterling.

207.   Second, even if there was some kind of evidence of the damage – *quod non* – the Sole Arbitrator is also not convinced that a causal link exists between the alleged injury and unlawful conduct attributable to the Respondent. Indeed, the Sole Arbitrator has determined that the only breach imputable to the Respondent is its failure to pay the Sixth Invoice and he has expressly dismissed the Respondent's responsibility in the dismissal of Mr. Filiatreault[232] – the event which, according to the Claimant, caused its loss of reputation.

208.   <u>In conclusion</u>, the Sole Arbitrator dismisses the Claimant's request to be awarded moral damages in the amount of USD 4.5 million.

## VI.5. FIFTH ISSUE – THE CLAIMANT'S COLLECTION COSTS

209.   The Claimant contends that it has spent important amounts of time and money trying to collect the sums that were due by the Respondent (**1.**). The Respondent argues that even if such amounts were in fact accurate, it would not be responsible for their payment (**2.**).

### 1.   THE CLAIMANT'S POSITION

210.   Since 2008 the Claimant has tried several times to reach a solution with the Respondent, incurring significant costs and expenses[233].

211.   Indeed, the Claimant represents having spent more than 200 days during the past seven years trying to collect the sums owed by the Respondent, sending letters and filing arbitrations, to no avail[234].

---

[230] Doc C 50.
[231] Doc C 34.
[232] See para. 194 *supra*.
[233] C SR, para. 42.
[234] C SC, para. 60; C SR, para. 45-47 and 84.

212. By applying the 2004 billing rates included in the Claimant's bid proposal, the level of work carried out by the Claimant trying to collect costs represented USD 210,000, by the time it submitted its Statement of Claim[235].

## 2. THE RESPONDENT'S POSITION

213. The Respondent argues that the Claimant is not entitled to receive any collection costs[236].

214. The Respondent made very clear as early as 8 January 2009 that it considered that the Claimant's mandate had not been completed, and that the Claimant was not entitled to payment[237]. Despite the Respondent's clear position, which had been reiterated multiple times, the Claimant chose to continue writing letters, most of which had the same content[238].

215. Regarding the two claims for arbitration filed first with the ADR and then with the ICDR, the Respondent notes that there was never any agreement between the Parties to resort to such institutions. Therefore, the Respondent was not required to answer those requests for arbitration[239]. If the Claimant had immediately submitted a request to the PCA, it would have saved time and money[240].

216. In any event, the Claimant has failed to provide evidence regarding the time it spent[241]; and the amounts claimed are also illogical: the Claimant applies the same rates for managing the airline to the drafting of collection letters[242].

## 3. THE SOLE ARBITRATOR'S DECISION

217. The Sole Arbitrator finds that, once again, the Claimant has not discharged the burden of proof for this claim: the Claimant does not file one single piece of evidence showing any of the amounts being claimed.

218. But even if some proof had been marshalled – *quod non* – the Sole Arbitrator notes that the Claimant has failed to establish why it should be entitled under Cabo Verdean law to a specific indemnification for this type of alleged harm.

219. Additionally, as with regards to the arbitration costs of the failed arbitration procedures commenced by the Claimant against the Respondent before alternative *fora*[243], these costs are solely attributable to the Claimant, because the Parties had never agreed to an arbitration before any of those institutions.

---

[235] C SC, para. 60 and 68; C SR, para. 84.
[236] R SD, para. 2.7.
[237] R SD, para. 3.57.
[238] R SD, para. 3.58.
[239] R SD, para. 3.59 and 3.60.
[240] R SD, para. 3.61.
[241] R SD, para. 4.56.
[242] R SD, para 4.55.
[243] Doc C 28 and C 29.

220. In light of the above, the Sole Arbitrator dismisses the Claimant's request to be awarded collection costs.

PCA Case No. 2014-33
Award

# VII.   INTEREST

221.  Sterling has requested pre and post-award interest on awarded amounts:

Statement of Claim

"79. B. Ordering the Respondent to pay to the Claimant [...]

iii. interest on any payment awarded above a compound annual rate of 10 percent through the date of the award. [...]

vii. ordering post-award interest at an annual rate of 10 percent compounded monthly until the award is paid in full".

Statement of Reply

"94. The Claimant respectfully submits that the Tribunal should issue an award in its favour and against the Respondent: [...] (e) Ordering the Respondent to pay interest at a simple annual rate of 10.1% until the arbitral award is fully paid [...]"[244].

222.  Cabo Verde disputes this claim[245]:

"8.2 [...] Respondent hereby confirms its request that the Sole Arbitrator adjudge and declare that: [...] (iv) Respondent is not liable for any interest whatsoever over any of the above mentioned amounts, let alone calculated at an interest rate of 10% [...]".

## VII.1.   THE CLAIMANT'S POSITION

223.  The Claimant avers that according to data provided by Trading Economics[246], the benchmark interest rate in Cabo Verde was last recorded at 7.5%. Interest rates in Cabo Verde averaged 8.48% from 1998 until 2015, reaching an all-time high of 10.5% in February of 1998 and a record low of 6% in February of 2008. The Claimant adds that the interest rate charged by the Central Bank of Cabo Verde averaged 7.5%, but for commercial banks in Cabo Verde, during the period when the invoices were issued, the interest rate was over 10.1%[247].

224.  In its Statement of Claim, the Claimant requests payment of interest at a compound annual rate of 10%, but in its Statement of Reply, it claims a simple annual rate of 10.1%, until the arbitral award is fully paid[248].

---

[244] C SR, para. 94(e).
[245] R SR, para. 8.2(iv).
[246] C SC, para. 58; C SR, para. 92.
[247] C SC, para. 58.
[248] C SR, para. 94(e).

PCA Case No. 2014-33
Award

225. As to the *dies a quo*, the Claimant submits that interest should accrue from the date each invoice was issued[249].

## VII.2.   THE RESPONDENT'S POSITION

226. The Respondent argues that even if any of Sterling's claims were to succeed, the applicable interest rate would never reach the Claimant's proposal[250].

227. Article 806.2 of Cabo Verde's Civil Code provides that when a pecuniary obligation has been breached, interest is due over the relevant amount at the legal rate in force at the time[251].

228. According to the Respondent, the legal interest rate is set at 8% by the Joint Order No. 12/97 of the Ministers of Planning, Finance and Justice, enacted on 24 March 1997, in accordance with Article 559 of Cabo Verde's Civil Code[252].

229. Also, according to Article 805.3 of the Civil Code, no interest can accrue over an amount which is not yet due, and therefore no interest should be accounted until the day when any amounts are found to be due by an award[253].

230. Finally, Cabo Verde's Civil Code does not allow for compound interest unless specifically agreed by the parties, as provided for in Article 560.1[254].

## VII.3.   THE SOLE ARBITRATOR'S DECISION

231. The Sole Arbitrator finds that since the Respondent is being ordered to pay the amount of USD 190,098.12, included in the Sixth Invoice, pursuant to Article 804 of Cabo Verde's Civil Code, interest shall accrue on this delayed payment[255].

Rate

232. As correctly pointed out by the Respondent, Article 806.2 of the Civil Code provides that, in the absence of a specific agreement by the Parties, the applicable interest rate is the legal interest rate[256]. And Article 559 stipulates that the legal interest rate is defined by joint order of the Ministries of Justice and Finance. In the

---

[249] Doc C 31.
[250] R SD, para. 2.6 and 4.68.
[251] R SD, para. 4.70.
[252] R SD, para. 4.71.
[253] R SD, para. 4.72.
[254] R SD, para. 4.73.
[255] Doc CLA 1, Article 804:
"*1. A simples mora constitui o devedor na obrigação de reparar os danos causados ao credor.*
*2. O devedor considera-se constituído em mora quando por causa que lhe seja imputável, a prestação, ainda possível, não foi efectuada no tempo devido*".
[256] Doc CLA 1, Article 806.2: "*Os juros devidos são os juros legais, salvo se antes da mora for devido um juro mais elevado ou as partes houverem estipulado um juro moratório diferente do legal*".

joint order issued on 24 March 1997, the annual legal interest rate was fixed at 8%[257].

233.   The Sole Arbitrator notes that the Claimant has argued that the order of 24 March 1997 is outdated[258], but finds that such allegation is unsupported: the Parties have not referred to any subsequent ministerial order replacing the one issued in 1997; it thus seems that 8% is the legal interest rate in force in Cabo Verde. This conclusion is further confirmed by the Claimant's own interest calculation, which (contrary to what is actually claimed) is based on a rate of 8.48%[259], which is close to Cabo Verde's legal interest rate.

*Dies a quo*

234.   The Claimant argues that the amounts are due from the date of issuance of each invoice, while the Respondent states that no amount is considered due until a decision awarding such amounts is rendered. The Sole Arbitrator is not persuaded by either argument.

235.   Article 806.1 of Cabo Verde's Civil Code provides that interest is due from the day the debtor is in "*mora*" (in default)[260]. Article 805.1 states that a debtor is only considered to be *in mora* after having been judicially or extra judicially notified to pay[261]; but Article 805.2.a) qualifies that the debtor is considered to have defaulted, regardless of such notification, when the obligation has to be complied with within a fixed term[262].

236.   In principle, the Sixth Invoice was due 30 days after receipt thereof, pursuant to Article 6.5 of the Special Conditions[263]; in this case, 30 December 2007. However, contractual provisions have to be interpreted according to the standards of good faith and reasonableness, and to the Parties' real intention[264]. The Sole Arbitrator is persuaded that it could not have been the Parties' intention that the final payment become due before the Claimant had issued the Final Management Report and the Respondent could evaluate Sterling's management – the triggering event for the final payment. Given that Article 6.4 of the Special Conditions provides that the last payment is subject to the Respondent's positive evaluation of Sterling's management, it is reasonable to assume that the Parties envisaged the following timeline of events:

    –   First, the Claimant produces its Final Management Report;

---

[257] Doc RLA 7, Art. 1.
[258] C SR, para. 92.
[259] Doc C 31.
[260] Doc CLA 1, Article 806.1: "*Na obrigação pecuniária a indemnização corresponde aos juros a contar do dia da constituição em mora*".
[261] "*O devedor só fica constituído em mora depois de ter sido judicial ou extrajudicialmente interpelado para cumprir*".
[262] "*Há, porém, mora do devedor, independentemente de interpelação: a. Se a obrigação tiver prazo certo*".
[263] "Payment shall be made within twenty (20) days of receipt of the invoice and the relevant documents specified in Clause 6.4, and within thirty (30) days in the case of the final payment".
[264] Article 236.2 of the Civil Code: "*Sempre que o declaratário conheça a vontade real do declarante, é de acordo com ela que vale a declaração emitida*". Also Article 236.1 already transcribed in fn. 155 *supra*.

PCA Case No. 2014-33
Award

    –    Then, the Respondent performs an evaluation of the management (Article 6.4), based on the information contained in the Final Management Report;

    –    After the Respondent has given a positive review, the Claimant issues the invoice for the final payment of the outstanding 20% of the Contract price;

    –    The Respondent pays the invoice within 30 days of receipt (Article 6.5).

237.  The Claimant altered the above order and issued the invoice first, with the result that the due date was artificially brought forward and that the rule that payment should be made within 30 days of receipt of the invoice became moot. The consequence is that the payment obligation now lacks a specific term and that pursuant to Article 805 interest starts to accrue when the Claimant judicially or extra judicially requests the Respondent to pay.

238.  The Sole Arbitrator has reviewed the file and the first evidence of such request is the 29 January 2009 letter[265] in which the Claimant notifies the Respondent that[266]:

       "this clearly means that the corresponding invoice for this report is due […]".

239.  The Sole Arbitrator finds that this letter constitutes the first notification to pay, in the sense of Article 805.1 of the Civil Code and the *dies a quo* is thus, set at 29 January 2009.

    *Dies ad quem*

240.  The Sole Arbitrator notes that the Claimant has requested pre and post-award interest at the same rate. Therefore, interest on awarded amounts shall accrue until the date of actual payment.

    Calculation methodology

241.  Initially the Claimant had requested compounded interest, but in its last submission, it claims simple interest. The Sole Arbitrator concurs that simple interest is appropriate.

242.  Interest shall thus accrue on the principal amount of USD 190,098.12 at a rate of 8% *per annum*, from 29 January 2009 until the date of actual payment.

---

[265] Doc C 25.
[266] Doc C 25, p. 2.

PCA Case No. 2014-33
Award

# VIII.  COSTS

243.  Both Parties have requested to be awarded costs.

244.  The Sole Arbitrator invited the Parties to submit their Statements on Costs in Communication A 6[267]. On 26 and 28 September 2015, the Respondent and the Claimant, respectively, submitted the details of the costs they had incurred.

### VIII.1.  THE CLAIMANT'S POSITION

245.  The Claimant requests the payment by Cabo Verde of the following costs and expenses[268]:

   –   Legal fees: USD 23,800[269];
   –   Sole Arbitrator's fees and case administration expenses: USD 6,750[270].

### VIII.2.  THE RESPONDENT'S POSITION

246.  The Respondent submits that the allocation of costs in the present case should take into account not only the degree of success of the Parties' claims, but also other circumstances, and in particular, the Claimant's misconduct as explained in paragraph 2 of the Respondent's Statement of Rejoinder[271].

247.  In particular, Cabo Verde requests the payment by Sterling of the following costs and expenses[272]:

   –   Legal fees and disbursements: Between USD 32,722.09 and USD 52,722.09[273];
   –   Sole Arbitrator's fees and case administration expenses: USD 6,000[274].

---

[267] Communication A 6, para. 5.
[268] C St. C., para. 6-9.
[269] C St. C., para. 7: The Claimant's legal representative, M. Luis González García, started work on behalf of the Claimant on 18 March 2015, and spent a total of 129 hours in this arbitration.
[270] C St. C., para. 8: USD 6,000.00 as initial deposit, plus filing fees of USD 750.00.
[271] R St. C., para. 3.1-3.4.
[272] R St. C., para. 2.1-2.6.
[273] R St. C., para 2.1-2.5: The Respondent established with its legal counsel a flat fee of USD 30,000 as payment for legal representation. It also agreed on the payment of a success fee, to be capped at USD 20,000.00. Hence, the total amount of legal fees ranges between USD 30,000.00 and 50,000.00. The Respondent's legal counsel also incurred USD 2,722.09 in disbursements.
[274] R St. C., para. 2.6: On 13 February 2015, the Respondent paid USD 6,000.00 as initial deposit to the PCA.

PCA Case No. 2014-33
Award

### VIII.3.  THE SOLE ARBITRATOR'S DECISION

248.  Article 40.1 of the UNCITRAL Rules requires that the arbitral tribunal – in this case, the Sole Arbitrator – fix "the costs of arbitration in the final award […]".

249.  The "costs of arbitration" are defined in Article 40.2:

> "The term "costs" includes only:
>
> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;
>
> (b) The reasonable travel and other expenses incurred by the arbitrators;
>
> (c) The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e) The legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f) Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA".

250.  Article 42.1 of the UNCITRAL Rules provides that:

> "The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case".

251.  The Sole Arbitrator will first address the legal and other costs incurred by the Parties (Article 40.1.e)) [the "**Legal Fees**"] (**A.**), and then the fees of the arbitral tribunal (in this case, the Sole Arbitrator) as well as the fees and expenses of the appointing authority (Article 40.1.a, b, c and f) [the "**Arbitrator's Fees**"] (**B.**). Finally, it will decide on interest accrual (**C.**).

#### A.    The apportionment of the Legal Fees between the Parties

252.  The terms of Article 42.1 give the Sole Arbitrator substantial flexibility to decide whether the costs of the arbitration should be borne by one party (the unsuccessful one) or be apportioned "between the parties." Nevertheless, the wording of this provision points to a preference for the application of the "loser pays" principle, as the Respondent in the present case also notes[275].

253.  In this case, the Claimant has brought an aggregate claim of USD 5,265,174 but has only been successful in respect of USD 190,098.12. This represents a success rate of 4%.

---

[275] R St. C., para. 3.2.

59

PCA Case No. 2014-33
Award

254. However, the Sole Arbitrator finds that it would be unfair to measure the Claimant's success rate solely based on the quantum because, although the only claim won bears relatively little significance in respect of the amount, it has been by far the most relevant of the legal questions in this arbitration. If one considers that the Claimant has devoted approximately 50 pages of its submissions to legal issues, some 30 pages of which were related to the payment of the Sixth Invoice – an issue on which the Claimant has been completely successful – this would represent a success rate of 60%.

255. The Sole Arbitrator decides to determine the Claimant's success as a combination of the above success rates, which are weighted equally: (4% + 60%)/2 = 32%.

256. The Claimant has requested a reimbursement of USD 23,800 as legal fees. The Sole Arbitrator finds that this amount is reasonable and orders that the Respondent assumes 32% thereof, i.e. USD 7,616.

<u>The Conduct of the Parties</u>

257. Tribunals have gone further in awarding costs to a party as compensation for expenses incurred as a direct result of another party's conduct that was frivolous, in bad faith, or unnecessarily burdensome.[276]

258. In the present case, the Respondent submitted that the Claimant's behaviour in this arbitration amounted to misconduct, and should, as such, be sanctioned by the Sole Arbitrator when apportioning costs[277].

259. On the other hand, the Claimant has argued that[278]:

> "There is no evidence that the Claimant pursued dilatory tactics in these proceedings. The Claimant focused its submissions and evidence on the core issues and put forward the witness best positioned to speak on those material issues. The Sole Arbitrator should also take account of the fact that the Respondent raised every argument available to defend the claim some which were implausible and took a highly confrontational tone in all of its submissions".

And that:

> "In relation to the bold allegation made by the Respondent in Section 2 of the Rejoinder in relation to the alleged misconduct of the Claimant, it is respectfully submitted that it is extremely regrettable that counsel for the Respondent has resorted to such tactic in the arbitration and it did so in an aggressive and confrontational tone, unusual in international arbitration. This is a serious accusation which the Sole Arbitrator should take into account in the assessment of allocation of costs. The Claimant notes that nothing prevents

---

[276] David D. Caron and Lee M. Caplan, *The UNCITRAL Arbitration Rules: A Commentary (with an Integrated and Comparative Discussion of the 2010 and 1976 UNCITRAL Arbitration Rules)* (Oxford: Oxford University Press, Second Edition, 2013), pp. 871-872.
[277] R SR, para. 2.1-2.6; R St. C., para. 3.4.
[278] C St. C., para. 4.

> a party from adducing certain evidence in the Reply which was not filed in the first submission but responds directly to claims and allegations made for the first time by the Respondent in the Counter-Memorial."[279]

260. The Sole Arbitrator disagrees with the Respondent's assertions and, partially, with the Claimant's argumentation.

261. Indeed, as decided in Section II.8 of the present award, the Respondent's motion to strike certain evidence from the record and/or to apply the appropriate remedy foreseen in the IBA Guidelines was dismissed.

262. As to the Claimant's line of argumentation, it fails to persuade the Sole Arbitrator. As any party to a judicial dispute, the Respondent raised the arguments it thought appropriate to convince the Sole Arbitrator. The Sole Arbitrator has also not observed the "aggressive and confrontational tone" of which the Claimant complains.

263. Therefore, the Sole Arbitrator has perceived no signs of misconduct or bad faith.

### B.   The Arbitrator's Fees

264. The Arbitrator's fees includes the fees and expenses of the Sole Arbitrator and the PCA

265. The total amount deposited with the PCA to cover theses costs is USD 12,000 and EUR 750. This amount was contributed as follows: USD 6,000 and EUR 750 by the Claimant and USD 6,000 by the Respondent.

266. The actual costs break down is:

- The Sole Arbitrator's flat fee pursuant to the Terms of Appointment: USD 10,000;

- The Sole Arbitrator's expenses: USD 314.50 (EUR 289.92);

- Expenses of the PCA in its role as registry pursuant to the Terms of Appointment: USD 250;

- Fee of the Secretary-General of the PCA in his role as appointing authority: EUR 750.

267. Accordingly, the costs of the arbitration set out in Article 4.2.a, b, c and f of the UNCITRAL Rules amount to USD 10,434.71 and EUR 750. The unexpended balance of the Parties' deposit amount to USD 1,435.5.

---

[279] C St. C., fn. 2.

268. Pursuant to Article 40.2 the Sole Arbitrator has discretion to award arbitration costs in a reasonable way, taking into account primarily the success rate but also other circumstances of the case.

269. The Sole Arbitrator has determined that the **Claimant's success rate has been 32%.** But since the Sole Arbitrator is also empowered to take into consideration the circumstances of the case: the Sole Arbitrator is reasonably satisfied that, had the Respondent paid the Sixth Invoice as it should have, this arbitration could have been avoided. It is, however, equally true that the Claimant has pursued claims in this arbitration which have been dismissed almost *ad limine* for lack of evidence.

270. In view of this, the Sole Arbitrator decides that the Arbitrator's fees be divided equally among both Parties. Accordingly, the Respondent is ordered to reimburse the Claimant EUR 375, representing half of the difference between the amounts contributed by the Parties (EUR 750/2).

271. Pursuant to Article 43.5 of the UNCITRAL Rules, the unexpended balance of the deposit will be reimbursed by the PCA to the Parties in equal shares.

## C.   **Interest**

272. The Claimant has requested post-award interest on awarded amounts[280]. Interest shall thus accrue also on the costs of arbitration awarded herein, which have been quantified at USD 7,616 and EUR 375. On these amounts, interest shall accrue at a rate of 8% *per annum* from the date of the award until the date of actual payment.

---

[280] See para. 221 *supra.*

# IX. DECISION

273. Based on the above reasons, the Sole Arbitrator:

1.  Orders the Republic of Cabo Verde to pay to Sterling Merchant Finance Ltd an amount of USD 190,098.12 due under Invoice No. RBJ/pd/372;

2.  Orders the Republic of Cabo Verde to pay to Sterling Merchant Finance Ltd interest at a simple annual rate of 8% p.a. on the amount stated in para. 273(1) *supra* from 29 January 2009 until full payment;

3.  Orders the Republic of Cabo Verde to pay to Sterling Merchant Finance Ltd USD 7,616 and EUR 375 as arbitration costs;

4.  Orders the Republic of Cabo Verde to pay to Sterling Merchant Finance Ltd interest at a simple annual rate of 8% p.a. on the amount stated in para. 273(3) *supra* from the date of this award until full payment;

5.  Dismisses all other claims and prayers for relief.

Place of arbitration: The Hague, The Netherlands.

Date of this Award: 27 November 2015.

Juan Fernández-Armesto

# Statement of Certification of Copy

I, <u>Roger B. Jantio</u>, swear that the attached is a true, authentic and complete copy of the AWARD document produced on November 27, 2015 by Sole Arbitrator, Professor Juan Fernandez-Armesto in the matter of an arbitration between Sterling Merchant Finance Ltd, the Claimant, and The Government of the Republic of Cabo Verde, the Respondent, under the Permanent Court of Arbitration Case No. 2014-33, made by me.

Name: Roger B. Jantio

(Signature of Affiant)

Sworn to and subscribed before me this <u>2th</u> day of <u>May</u>, 20 <u>16</u> by Sir Roger B. Jantio.

[ ] Personally known
[x] Produced Identification
Type of ID: <u>Virginia Driver License No. A66031107</u>

Signature of Notary: <u>Lisa M. Banks</u>

Name of the Notary: <u>Lisa M. Banks</u>

My Commission Expires: <u>April 30, 2021</u>

LISA M. BANKS
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires April 30, 2021